JOHN T. BRADY & COMPANY,
Appellee,

v.

The UNITED STATES, Appellant.

No. 173–80C.

United States Court of Appeals,
Federal Circuit.

Nov. 18, 1982.

Francis J. Sailer, Washington, D.C., argued for U.S. With him on the briefs was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C.

Lester M.A. Gulitz, New York City, argued for appellee. With him on the briefs were Tunstead, Schechter & Torre, Michael S. Torre, New York City, and Marvin Schechter, Forest Hills, N.Y.

Before RICH, Circuit Judge, COWEN, Senior Circuit Judge, and KASHIWA, Circuit Judge.

COWEN, Senior Circuit Judge.

The Government appeals from a judgment * of the United States Claims Court which denied the parties' cross-motions for summary judgment and ordered the case remanded to the Veterans Administration Contract Appeals Board (Board) for further proceedings consistent with the opinion of the trial judge. In a Wunderlich Act review, he held that the Board erroneously decided that appellee's failure to request an exception to the Buy American Act at the time the bid was submitted precluded appellee's right to have such a request considered after the contract was awarded. For the reasons to be set forth, we agree with the result reached by the court below and affirm its order remanding the case to the Board for further proceedings.

## I. The Facts and Prior Proceedings.

The facts which are material to our decision are relatively simple and undisputed. On February 25, 1977, appellee was awarded a contract with the Veterans Administration in the amount of $3,827,000, for the general architectural work associated with the construction of the Research Building adjacent to the Veterans Administration Replacement Hospital in Bronx, New York. The contract incorporated the provisions of the Buy American Act, and required that all but certain excepted construction materials be of domestic origin. One of appellee's subcontractors, Albro Metal Products Corporation (Albro) was responsible for supplying and constructing a metal curtain wall. Albro's contract price was based in part on a quotation it had received on Feb-

---

* Pursuant to order of this court dated October 4, 1982, Judge Louis Spector, of the United States Claims Court entered a judgment on October 8, 1982, corresponding to the decision recommended in this case.

ruary 3, 1977, from the Aluminum Company of America (ALCOA), in the amount of $140,000, for the flat aluminum sheet required to construct the metal curtain wall. ALCOA would not accept a firm order for the aluminum sheet until the size and type of aluminum had been determined and approved by the Veterans Administration.

Prior to the award of the prime contract to appellee, Albro received quotations from ALCOA which reflected substantial price increases over the first quotation. At a meeting held June 8, 1977, Albro informed the Government's representatives that ALCOA's price for aluminum had risen from $.97 to $1.56 a pound during the preceding 4 months; that the price increase was industrywide; that he had been advised by other domestic producers that they were stopping their production of this aluminum. Therefore, Albro stated, the material could be produced only on special order to ALCOA at a premium price, and that ALCOA would not accept a firm offer until after specific sheet sizes had been determined.

At the time of the meeting of June 8, 1977, the specific sheet sizes of the aluminum had not been determined or approved by the Veterans Administration. Consequently, the appellee was not able to place a firm order for the aluminum with ALCOA until after that date.

The contract contained a provision implementing the Buy American Act and the regulations issued thereunder, as follows:

24. Buy American

(a) *Agreement.* In accordance with the Buy American Act (41 U.S.C. 10a–10d), and Executive Order 10582, December 17, 1954 (3 CFR, 1954–58 Comp., p. 230), as amended by Executive Order 11051, September 27, 1962 (3 CFR, 1959–63 Comp., p. 635), the Contractor agrees that only domestic construction material will be used (by the Contractor, subcon-

tractors, materialmen, and suppliers) in the performance of this contract, except for nondomestic material listed in the contract.

At the time of the meeting, Albro requested permission to use sheet manufactured in Japan, claiming that the Japanese material was available at the price originally quoted by ALCOA. Shortly thereafter, Albro submitted a formal request to the contracting officer, who denied the request, stating that there was no provision in the Buy American Act which would permit him to approve the use of nondomestic materials after the contract was awarded. He did not submit the request to the head of the department to determine whether an exception to the Act should be granted. Following the receipt of this decision, Albro ordered the aluminum sheet from ALCOA at a total price of $190,806.87.

The contract contained standard "disputes" and "changes" clauses. In accordance with the Wunderlich Act, 41 U.S.C. §§ 321 and 322, the "disputes" clause stated that nothing in the contract was to be construed as "making final the decision of any administrative official, representative, or board on a question of law."

The adverse decision of the contracting officer was appealed to the Board, where appellee contended that the cost of domestic aluminum was unreasonable when compared with the cost of Japanese aluminum; that the Buy American Act does not prohibit the substitution of nondomestic materials after the contract has been awarded; that the Act allows the head of a department or agency to determine that the use of American-made goods is inconsistent with the public interest and/or that the cost is unreasonable, and that the Act does not require that this determination be made before the contract is awarded.[1]

In rejecting appellee's contention, the Board, in its decision, quoted the following from the invitation for bids:

1. Before the Board, appellee also contended that its proposed use of Japanese aluminum was permissible because the cost of the foreign product constituted less than 50 percent of the

cost of the construction material. Both the Board and the court below ruled against appellee on this contention and it has since been abandoned. Therefore, we find that the Japa-

(b)(1) Furthermore, bids or proposals offering use of additional non-domestic construction material may be acceptable for award if the Government determines that use of comparable domestic construction material is impracticable or would unreasonably increase the cost or that domestic construction material (in sufficient and reasonably available commercial quantities and of a satisfactory quality) [or] is unavailable. Reliable evidence shall be furnished justifying such use of additional nondomestic construction material.

The Board held that "failure to request an exception to the Buy American Act at the time of bid in accordance with bidding directions precludes entitlement to consideration of an exception after award."

By petition filed in the former United States Court of Claims, the appellee sought a reversal of the Board's decision and asserted a claim for damages in the sum of $71,934.65. Following the filing of the parties' cross-motions for summary judgment, the trial judge issued an opinion in which he disagreed with the Board and concluded that an exception to the Buy American Act may be granted by means of a change order after the contract has been awarded. However, he ordered that the case be remanded to the Board to determine whether the exception should have been granted. It is from the judgment entered in accordance with that opinion that the appeal to this court was taken.

## II. *The Buy American Act and Executive Order No. 11051.*

The Buy American Act, as codified in 41 U.S.C. §§ 10a, 10b, and 10d, provides in pertinent part as follows:

§ 10a. *American materials required for public use*

Notwithstanding any other provision of law, and unless the head of the department or independent establishment concerned shall determine it to be inconsistent with the public interest, or the cost to be unreasonable, only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States, shall be acquired for public use.
* * *

§ 10b. *Contracts for public works; specification for use of American materials; blacklisting contractors violating requirements*

(a) Every contract for the construction, alteration, or repair of any public building or public work in the United States growing out of an appropriation heretofore made or hereafter to be made shall contain a provision that in the performance of the work the contractor, subcontractors, materialmen, or suppliers, shall use only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the United States except as provided in section 10a of this title: *Provided, however,* That if the head of the department or independent establishment making the contract shall find that in respect to some particular articles, materials, or supplies it is impracticable to make such requirement or that it would unreasonably increase the cost, an exception shall be noted in the specifications as to that particular article, material, or supply, and a public record made of the findings which justified the exception.
* * *

nese aluminum did not qualify as domestic construction material required by article 24(a) of

the contract.

**§ 10d.** *Clarification of Congressional intent regarding sections 10a and 10b(a)*

In order to clarify the original intent of Congress, hereafter, section 10a of this title and that part of section 10b(a) of this title preceding the words "*Provided, however,*" shall be regarded as requiring the purchase, for public use within the United States, of articles, materials, or supplies manufactured in the United States in sufficient and reasonably available commercial quantities and of a satisfactory quality, unless the head of the department or independent establishment concerned shall determine their purchase to be inconsistent with the public interest or their cost to be unreasonable.

Executive Order No. 10582, as amended by Executive Order No. 11051 of September 27, 1962, 27 Fed.Reg. 9683, provides in part as follows:

Whereas in the administration of the act of March 3, 1933, 47 Stat. 1520, 41 U.S.C. 10a–10c; 41 U.S.C. 10d, commonly known as the Buy-American Act [41 USCS §§ 10a et seq.], and other laws requiring the application of the Buy-American Act, the heads of executive agencies are required to determine, as a condition precedent to the purchase by their agencies of materials of foreign origin for public use within the United States, (a) that the price of like materials of domestic origin is unreasonable, or (b) that the purchase of like materials of domestic origin is inconsistent with the public interest; and Whereas it is desirable and in the public interest that such determinations be made on as uniform a basis as possible. Now, Therefore, by virtue of the authority vested in me as President of the United States, it is hereby ordered as follows: * * *

Sec. 2.  (b) For the purposes of the said act of March 3, 1933 [41 USCS §§ 10a et seq.], and the other laws referred to in the first paragraph of the preamble of this order, the bid or offered price of materials of domestic origin shall be deemed to be unreasonable, or the purchase of such materials shall be deemed to be inconsistent with the public interest, if the bid or offered price thereof exceeds the sum of the bid or offered price of like materials of foreign origin and a differential computed as provided in subsection (c) of this section.

(c) The executive agency concerned shall in each instance determine the amount of the differential referred to in subsection (b) of this section on the basis of one of the following-described formulas, subject to the terms thereof:

(1) The sum determined by computing six per centum of the bid or offered price of materials of foreign origin.

(2) The sum determined by computing ten per centum of the bid or offered price of materials of foreign origin exclusive of applicable duty and all costs incurred after arrival in the United States: provided that when the bid or offered price of materials of foreign origin amounts to less than $25,000, the sum shall be determined by computing ten per centum of such price exclusive only of applicable duty. * * *

### III.  *Analysis.*

Upon the undisputed facts, the issue to be decided is a pure question of law: whether the Board erroneously held that exceptions to the Buy American Act cannot be granted after the contract has been awarded.[2] As previously indicated, no finality attaches to the Board's conclusions of law; the courts are free to decide such questions of law. Except for the judgment of the United States Claims Court (the subject of this

---

**2.** Appellant argues erroneously that the issue is whether the contracting officer had authority to waive the provisions of the Buy American Act. As shown, *supra,* appellee contended before the Board and argues here that *exceptions* to the Act are specifically provided for in the statute and that these may be granted after award of the contract. This is the issue we decide.

appeal), we have been unable to find any court decision which has considered the question. The Board's holding is supported by several administrative rulings, including *Edwin Moss & Son, Inc.,* GSBCA–4521, 77–1 BCA 12,517; *Wright & Morrisey, Inc.,* VA-CAB–1147, 76–2 BCA 11,955 and *Klefstad Engineering Co. & Blackhawk Heating & Plumbing Co.,* VACAB–551, 66–2 BCA 5987 (*reversed on reconsideration on other grounds,* 67–1 BCA 6393). Relying on these decisions, the appellant urges us to affirm the Board's decision and reverse the judgment of the Claims Court.

It is true that the Buy American Act, like other statutes requiring award to the lowest bidder, is directed primarily to the period prior to the award. But we find nothing in the Buy American Act, nor in Executive Order No. 11051, which requires that exceptions be requested and granted before the contract is awarded. Moreover, there is nothing in the Act nor in the Executive Order which prohibits changes to be made in the contract, if necessary, after it has been executed. Indeed, the preamble to the Executive Order states that determinations under the Act concerning the purchase of materials of foreign origin are to be made, not as a condition precedent to the award of the contract, but rather as a condition precedent to their purchase. The Executive Order also refers to "bid or offered price."

Since the passage of the Buy American Act, the Comptroller General of the United States has been called upon frequently to decide questions involving the interpretation and application of that Act and has acquired much expertise on the subject. In several rulings, he has concluded, contrary to the decisions of the Board and those relied upon by it, that exceptions to the Act may be granted after a Government contract has been awarded.

In 40 Comp.Gen. 644 (1961), the invitation for bids, which obligated the contractor to execute a formal contract incorporating the Buy American Act, contained a list of materials which the contractor was authorized to use without regard to country of origin. Copper was not included on the list. By inadvertence, the contract which was signed by the parties made several changes in the list of items exempt from the Buy American Act's provisions, and one of these was the inclusion of copper on the exempt list. Nevertheless, the contractor was required to substitute domestic copper for foreign copper, and the Comptroller General was called upon to decide whether the contractor was entitled to an equitable adjustment for the difference between the cost of the foreign and the domestic copper. The ruling stated, at p. 649:

Under the terms of the Buy American Act, the applicable regulations, and paragraphs 23 and 42 of the housing contract, a proper determination *could be made at any time to add items to, or delete them from, the exempt list.* In our view, any such change made after award which could reasonably be regarded as affecting bid prices *should have been made through the medium of a change order with, where appropriate, an accompanying equitable adjustment in price.* In this instance, while copper and aluminum were added to the exempt list in the contract document signed by the parties, a number of other items were deleted. The contractor could reasonably, and apparently did, therefore assume that a proper determination had been made, that the change in contract language was adopted in lieu of a change order, and that no adjustment in price was called for because the additions to the exempt list were balanced by the deletions. * * * (Emphasis added)

The same conclusion was reached in 42 Comp.Gen. 468 at (1963), 474–75, wherein it was stated:

[W]hile the act gives preference to domestic products, it does not prohibit, without any exception, the use of foreign products. To the contrary, the act expressly provides under section 3 for the same exceptions as provided under sec-

tion 2, including that the restrictions against the purchase of foreign products do not apply where it is determined that the cost of domestic products is unreasonable, as well as a further express provision, to the same effect, that those restrictions do not apply if it is found *"that it would unreasonably increase the cost."* The provisions of Executive Order No. 10582, setting forth criteria for use in making such determinations apply equally to both section 2 and 3 of the act. *Further, while section 3a, 41 U.S.C. 10(b)(a), requires that the exceptions so authorized shall be noted in the specifications, we do not agree, as apparently urged on your behalf, that they must be noted in the specifications of the invitation. Rather, a proper determination may be made at any time, including at the time of award, or during performance of the contract, to add items to, or delete them from, the exempt list. See 40 Comp.Gen. 644.* \* \* \* (Emphasis added)

▊ Judge Spector's opinion is in accord with the decisions of the Comptroller General which we think have correctly interpreted the Buy American Act and the Executive Order. To hold otherwise, would produce unfair and harsh results without furthering the objectives of the Act. As the trial judge stated, it may be impossible for the contractor in some instances to make a pre-award request for the exemption. In this case, the appellee could not order the aluminum until after the contract had been awarded and the type and size of aluminum sheet had been determined and approved by the Veterans Administration. There will be other instances where domestic material is unavailable or where its price escalates dramatically after the contract has been awarded.[3]

The Board has itself recognized that an exception to the Buy American Act may be granted after the contract has been awarded. *See M.S.I. Corp.,* VACAB No. 503, 65–2 BCA ¶ 5203. In that case, the material specified in the contract was unavailable from domestic sources. Although the contractor so advised the agency, there was a 67-day delay before an exception to the Buy American Act provision was granted. The Board ruled that after the contractor notified the agency that a domestic source for the product specified in the contract could not be located, the Government was obligated to decide whether to issue a change order deleting the material or to grant an exception to the Buy American Act so that the contractor could acquire the material from foreign sources.

Adherence to the rigid rule espoused by the appellant and the Board would prevent the head of the department from granting an exception after the contract has been awarded when he determines that the cost of domestic material would be unreasonable or that the use of such material would be inconsistent with the public interest.

Therefore, we decline to follow the administrative decisions relied upon by the Board and by appellant, and conclude that the Board erred in its basic holding.

### IV. *Exhaustion of the Administrative Remedy.*

The appellant, contending that appellee failed to exhaust its administrative remedy, stated that the only reference appellee made to the Board regarding the "changes" clause was contained in the post-hearing brief. Appellant also maintains that even if appellee exhausted its administrative remedy during its appeal to the Board, it has abandoned any claim it had under the "changes" clause, because there is no mention of the "changes" clause in appellee's submissions to the court below. We reject both contentions.

In making the first argument, appellant apparently failed to note that the Board

---

**3.** *See, e.g.,* Comp.Gen.Dec. B–174266 (22 Feb. 1972) (unpublished), in which the Comptroller General determined that, because the price of the specified domestic material had increased tremendously, it would have been unconscionable to require performance at that price, and consequently, permitted cancellation of the contract without liability.

understood that the remedy which appellee sought there is the same as it seeks here. The first sentence of its opinion states:

[Brady] seeks an equitable adjustment under the Changes clause of the contract based on refusal of the Contracting Officer to permit the substitution of Japanese aluminum for domestic aluminum after award of the contract.

█ In its motion for summary judgment filed in the United States Court of Claims, appellee contended vigorously that the Board's decision was erroneous as a matter of law, and that in view of the unreasonable cost of domestic aluminum, an exception should have been granted to authorize the use of the Japanese product. Appellee's motion also requested the court to set aside the decision of the Board and to render judgment in its favor for the difference between the bid price of the aluminum and its actual purchase price. Thus, the remedy which appellee sought was as well understood by the Court of Claims as it was by the Board. In any event, appellee's failure to delineate the "changes" clause as a basis for recovery—assuming that there was such a failure—does not bar the right to recover, since the relief it sought was clearly described and well understood. *Acme Process Equipment Co. v. United States,* 347 F.2d 509, 533 (Ct.Cl.1965). *Cf. Specialty Assembly & Packing Co. v. United States,* 298 F.2d 794, 796 (Ct.Cl.1962).

### V. *Conclusion.*

We agree with the order of the United States Claims Court remanding this case to the Board for a development of the requisite facts and a determination as to whether or not an exception to the Buy American Act should have been granted in this instance. We approve the directions contained in that order of remand, but we add that in the event the Board determines that the exception should have been granted, it should also decide whether appellee is entitled to an equitable adjustment, and, if so, the amount thereof.

AFFIRMED.