**L.G. LEFLER, INC., d/b/a Defco Construction Co.**

v.

**The UNITED STATES.**

No. 681–83C.

United States Claims Court.

Oct. 30, 1984.

Jon M. Wickwire, Vienna, Va., Anthony N. Palladino, Silver Spring, Md., of counsel, for plaintiff.

Michael A. Gordon, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

### OPINION

SETO, Judge.

In this suit brought under the Contract Disputes Act of 1978, 41 U.S.C. § 609 (Supp.1984), plaintiff seeks review of the decision of a Veteran's Administration ("VA") Contracting Officer, approving a credit, taken by the VA under the changes clause of the contract in question, for plaintiff's use of nondomestic structural steel. The credit followed a post-award waiver of the Buy American Act. The issue to be resolved is whether the reduction in contract price is warranted under the specific circumstances of this case. For the reasons stated below, plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied, and judgment is to be entered for plaintiff in the amount of $108,000.00.

### FACTS

On July 7, 1982, the VA issued an Invitation for Bids for the construction of an addition to the VA Medical Center in Tuscon, Arizona. As a contractor unsophisticated in the bidding process for government contracts, plaintiff, L.G. Lefler, Inc., d/b/a Defco Construction Company ("Defco"), interpreted the bid documents as permitting the use of foreign materials as the basis for its bid, provided the cost of comparable domestic material exceeded the cost of the foreign material by at least six percent (6%). Proceeding on this basis, Defco submitted a bid to the VA totalling $11,331,500, of which $1,028,000 was for structural steel work. The structural steel price was based on a bid received by Defco from the Phoenix Steel Manufacturing Company ("Phoenix") of $737,000, which partly was based on $439,000 worth of wide flange structural steel fabricated in Japan. Because the lowest quoted price for comparable domestic steel was $108,000 (24.6%) higher than the price quoted by Phoenix for Japanese steel, Defco assumed that its bid to the VA could incorporate the price for foreign steel.

Following a pre-bid conference on July 29, 1982, the bids were opened on August 18, 1982. Defco's bid was adjudged to be the low bid by $365,554 and the contract was awarded to Defco on September 30, 1982.

At a preconstruction conference on October 14, 1982, Defco was advised that *no* nondomestic products could be used on the

project because none had been identified in its bid, as required by the Buy American Act ("BAA"). Because it was no longer possible to cancel the order placed with the Japanese supplier, Defco met with the VA again on October 28, 1982, to indicate its intent to use nondomestic steel. On November 5, 1982, Defco submitted a letter to the VA documenting the fact that the cost of the nondomestic steel upon which its bid was based was more than 6% lower than the cost of domestic steel and requesting a waiver of the applicable provisions of the Buy American Act.

Following the advice of the VA's General Counsel, the VA Administrator approved a waiver of the BAA on January 20, 1983, thereby authorizing Defco to use the nondomestic steel on the project. However, to "deny the contractor any benefit from violating the Buy American Act," the VA imposed a credit against the contract price for Defco's use of the foreign steel. To implement this decision, the VA Contracting Officer issued Proceed Order No. 1 on February 24, 1983, characterizing the use of nondomestic steel as a change in work governed by Clause 3 (Changes Clause) of the contract. The Proceed Order requested Defco to submit a proposal for an equitable adjustment in the contract price, noting that the contract price would be decreased by $108,000 pending issuance of a change order.

On March 21, 1983, the Office of the Inspector General ("IG") at the VA completed a special report delineating the facts and circumstances regarding the decision to waive the Buy American Act. The IG Report indicates that (1) there is no evidence Defco received a direct financial gain by using foreign steel, (2) the evidence submitted establishes that Defco's bid was based on the cost of foreign steel, and (3) Defco would have remained the lowest bidder even if it had based its bid on the higher cost of domestic steel.

After evaluating Defco's certified claim of April 27, 1983, the Contracting Officer issued a final decision on July 20, 1983. In denying Defco's claim, the Contracting Officer indicated that the $108,000 reduction in contract price was necessary "to negate any unfair advantage you and your subcontractors may have gained by incorrectly basing your bid on nondomestic steel." On July 29, 1983, the Contracting Officer issued a unilateral change order implementing his final decision and decreasing the contract price by $108,000. Defco filed its action in this court on November 10, 1983, seeking relief as requested in its certified claim.

## DISCUSSION

At oral argument on October 4, 1984, counsel for plaintiff conceded that Defco was in violation of the Buy American Act until it received a waiver from the VA Administrator on January 20, 1983. However, plaintiff contests the propriety of the subsequent credit, taken by the VA under the auspices of the changes clause of the contract, for Defco's use of the foreign steel covered by the waiver. Plaintiff contends that there is no basis in law or equity for the imposition of such a credit. Defendant rejoins that the equitable adjustment to the contract price is appropriate because the VA was entitled to receive domestic steel under the contract terms and that the subsequent change order permitting the use of foreign steel decreased plaintiff's cost of performance.[1] Defendant further contends that the $108,000 credit was necessary to preclude plaintiff from deriving any profit from its violation of the Buy American Act, and to protect the competitive bidding process and the public interest.[2]

In implementing the waiver of the BAA, the VA contracting officer issued Proceed Order No. 1 "in accordance with Clause 3 of the General Provisions of the Contract", and stated that "the matter of contract price and time will be subject to equitable adjustment as provided therein." The

---

1. Defendant's Cross-Motion for Summary Judgment at 26.

2. *Id.* at 26–28.

change order of July 29, 1983, reflecting the contracting officer's final decision, effected a decrease in the contract price of $108,000—the difference between the cost of the domestic and foreign steel. Clause 3 of the contract reads, in pertinent part, as follows:

(d) If any change under this clause causes an increase or decrease in the contractor's cost of ... the performance of any part of the work under the contract, ... an equitable adjustment shall be made ....

Therefore, before the contract price can be decreased, there must exist a concommitant decrease in the contractor's cost of performance resulting from the change order.

■ In the instant case, there is no evidence that the change order effected a decrease in plaintiff's cost of performance so as to warrant the claimed equitable adjustment. The evidence submitted, including the report of the Inspector General of the VA, indicates that plaintiff based its bid on the lower cost of the foreign steel.[3] Because the original contract price, as bid by plaintiff, incorporates the price of the foreign steel, a later change order permitting its use does not decrease plaintiff's cost of performance. As a result, the changes clause, by itself, does not entitle defendant to an equitable adjustment in the contract price.

Defendant avers, however, that had plaintiff been held to the terms of the contract, it would have been required to utilize the higher-priced domestic steel, and that the VA's waiver of the BAA lowered plaintiff's cost of performance by allowing it to use the foreign steel. In positing that the VA could have required plaintiff to use the higher priced domestic steel, defendant's argument ignores the clear language of the statute.

The BAA, as implemented by Title 41 of the Code of Federal Regulations (CFR)[4], may be waived in certain circumstances:

§ 1–18.602–1 Buy American Policy (General)

Only domestic construction material shall be used in the performance of contracts for construction in the United States made by executive agencies, except for particular material as to which it is determined:

\*　　\*　　\*　　\*　　\*　　\*

(c) In accordance with § 1–18.603, that to make such requirement would unreasonably increase the cost. [41 C.F.R. § 1–18.602–1 (1982).]

The FPR provide further guidance for making an unreasonable cost determination:

§ 1–18.603–1 Unreasonable Cost Determination (General)

A determination *shall be made* that the use of domestic construction material would unreasonably increase the cost where, with respect to each particular construction material:

(a) A bid or proposal offers nondomestic construction material ... the cost of which, plus 6 percent thereof, is less than the cost of comparable domestic construction material; and

(b) That bid or proposal offers the lowest price of any received, after adding to each bid or proposal, for evaluation purposes, 6 percent of the cost of all nondomestic construction material, which qualifies under paragraph (a), of this section, offered in each bid or proposal. [41 C.F.R. § 1–18.603–1 (1982) (Emphasis supplied).]

Despite the regulatory directive that the use of domestic material *shall* be deemed to unreasonably increase the cost of performance in certain situations, thereby effectively mandating a waiver of the BAA,

---

**3.** Plaintiff's Exhibit 12 at 5–6. The motions for summary judgment, as supported by the pleadings and other materials on file, establish that there is no genuine issue as to any fact material to the disposition of this case. See RUSCC 56(c).

**4.** Subtitle A, Chapter 1, is entitled "Federal Procurement Regulations" ("FPR") and includes those government-wide procurement regulations issued by the General Services Administration.

the FPR further provide that an agency head may authorize deviation from the requirements of § 1–18.603–1. 41 C.F.R. § 1–18.603–3 (1982). In establishing the guidelines for such a deviation, the VA regulations state:

> When a contracting officer believes that the requirement of the "Buy American Act", is impractical . . . or that it would be *advantageous to the government to deviate from the provisions of FPR 1–18.603–1*, authority to consummate the contract will be requested. [41 C.F.R. § 8–18.603–3 (1982) (Emphasis supplied).]

■ Pursuant to this approach, it is incumbent upon the government to establish that a deviation from the requirements of § 1–18.603–1 is warranted.[5] Thus, where the standards delineated in § 1–18.603–1 are met, a waiver must be granted unless the particular circumstances of the situation warrant otherwise. Defendant maintains that it was coerced into granting the waiver because of plaintiff's violation of the BAA: "[Plaintiff] placed the VA in the position of insisting on compliance with the BAA and suffering delays in providing veterans with a badly needed hospital or granting a waiver. . . . The VA decided that it would give up the value of its contractual right to require domestic materials only because it would protect the competitive bidding process and the public interest with a reasonable change order which included a fair credit."[6]

■ Defendant's argument, however, ignores the requirement that to deny a waiver, the government must find that the

particular circumstances of the case before it warrant deviation from the provisions of FPR § 1–18.603–1. The government cannot meet its burden in that respect. We will not speculate as to what the VA Administrator would have done with a request for a post-award waiver regarding a bid originally based on the cost of domestic materials, nor with a request for a pre-award waiver regarding a bid incorporating the cost of foreign materials. The fact remains that, inasmuch as the requirements of § 1–18.603–1 have been met and the government has already determined that it would not be to its advantage to deviate from the provisions of that section,[7] the particular circumstances of this case warrant a waiver of the BAA. Because the VA has already determined that denial of the waiver would not be appropriate, it is difficult to see how, faced with the same operative facts, the VA could have defeated plaintiff's request for a waiver and require that only domestic materials be used.[8] Therefore, defendant's argument that the VA's waiver of the BAA lowered plaintiff's cost of performance by relieving it of the need to use domestic steel is without merit.

■ Even assuming, arguendo, that plaintiff's violation of the BAA forced the government to approve the waiver, the changes clause simply does not support an equitable adjustment in the contract price. By predicating the credit on the changes clause, defendant ignores the purpose of the provision therein permitting an equitable adjustment. As its name implies, an

---

5. Although it clearly contemplates a pre-award waiver of the BAA, § 8–18.603–3 is equally applicable to post-award situations following the decision in *John T. Brady v. United States,* 693 F.2d 1380 (Fed.Cir.1982). In *Brady,* the court held that an exception to the BAA may be granted after the contract has been awarded. It follows that the language which governs pre-award waivers also should apply to post-award waivers.

6. Defendant's cross-motion for summary judgment at 27–28.

7. Appendix to defendant's cross-motion for summary judgment at 19–22.

8. In 36 Comp.Gen. 718 (1957), the Comptroller General was faced with a violation of the BAA which resulted in the installation of a certain amount of foreign-made insulation in a government construction project. It held that in view of the small amount and value of the foreign product used as compared with the cost of its removal and replacement, together with the lack of bad faith on the contractor's part, it was not necessary to require the product's removal and replacement. *Id.* at 722. Debarment proceedings were discontinued and *no* credit was imposed.

"equitable adjustment" is designed to redress an unanticipated change in the contractor's cost of performance, occasioned by a change in work, from that originally reflected by the contract price. Here, the original contract price, as established by plaintiff's bid, clearly contemplates the use of foreign steel. To lower the contract price further would result in an unjustified windfall to the government. Therefore, the "equities" of the situation militate against the granting of the credit.

As further support for the adjustment to the contract price, defendant cites several decisions of the Comptroller General of the United States. *See Beckman Instruments, Inc.*, Comp.Gen. B–177649 (March 12, 1973); *Philadelphia Nail & Wire Co., Inc.*, Comp.Gen. B–154501 (August 11, 1964); 42 Comp.Gen. 401 (1963); 39 Comp. Gen. 599 (1960). Through these cases, the Comptroller General has fashioned a limited remedy to be applied on an ad hoc basis. Thus, in several circumstances where foreign materials were supplied instead of the domestic materials required by the BAA, and it was not practical to remove them, the contract price was adjusted by the difference in cost of the domestic and foreign materials. This remedy is designed to protect the competitive bidding process by precluding a contractor from deriving any "extra profit" from its violation of the Buy American Act. *See* 42 Comp.Gen. at 405. Moreover, the remedy is not to be applied blindly, but is to account for the operative facts of each situation and serve its underlying purposes. The facts of the instant case, however, indicate that these purposes are not served by the imposition of a credit.

▮ Defendant contends that the credit is necessary to preclude plaintiff from deriving any profit from its violation of the BAA, and to protect the competitive bid-

ding process and the public interest. We disagree. First, there is no evidence that plaintiff derived any "extra profit" from its use of foreign steel. Rather, the evidence indicates that because its bid incorporated the lower price of the foreign steel, plaintiff received no direct financial gain by using the foreign steel.[9] It is the VA's contention that the "profit" plaintiff is charged to have reaped is not monetary, but arose when plaintiff was awarded the contract without prior disclosure that its bid was based in part on foreign materials.[10] In seeking to preclude a contractor from deriving a "profit", the remedy fashioned by the Comptroller General addresses *monetary* profit beyond that originally contemplated by the contract price. Only where the government can establish that such profits exist, or will follow from the violation of the BAA, should a credit be pursued. *See Beckman*, unpub. op. at 2; 39 Comp.Gen. at 601.

Additionally, there is no evidence that either the competitive bidding system or the public interest was compromised by plaintiff's use of foreign steel. In finding that a credit was necessary to remedy prejudice to the other bidders, the VA stated that plaintiff had an advantage over the other bidders by partly basing its bid on foreign material.[11] The facts of the instant case simply do not support these assertions. Even if plaintiff had included only domestic materials in formulating its bid, thus increasing it by $108,000, the next lowest bid would have been at least $257,-000 higher than plaintiff's bid. Given either scenario, plaintiff would have been awarded the contract. Thus, the other bidders were not placed at a disadvantage by the award of the contract to plaintiff, and plaintiff did not derive any benefit by its use of foreign steel.[12]

---

9. *See* Report of the Inspector General, Plaintiff's Exhibit 12 at 5–6. In addition, the fact that plaintiff's bid is $365,000 lower than the next lowest bid militates against the conclusion that plaintiff received a financial benefit.

10. *Id.* at 8.

11. *See* Report of the Inspector General, Plaintiff's Exhibit 12 at 8; Final Decision of the VA Contracting Officer, Plaintiff's Exhibit 14 at 2.

12. An after-the-fact analysis of plaintiff's standing relative to the other bidders is appropriate in determining prejudice. In 48 Comp.Gen. 142 (1968), the low bidder to whom the contract

Furthermore, even if the competitive bidding process or the public interest had been compromised, it is not at all clear that the imposition of a credit would redress that harm. The BAA provides that the remedy for a violation of its terms is debarment. 41 U.S.C. § 10b(b) (1976). Moreover, 41 C.F.R. §§ 1–1.600 et seq. establish procedures for the debarment and suspension of bidders, remedies which "should be used for the purpose of protecting the interests of the Government ..." 41 C.F.R. § 1–1.601 (1982). These remedies would rectify any harm occurring to either the bidding process or the public as a result of a violation of the BAA better than would a credit against the contract price. *See* 41 C.F.R. § 1–1.600 et seq. The government should not use a credit in place of debarment or suspension, as the former serves clearly different purposes.[13] In the instant case, a reduction in the contract price for plaintiff's use of foreign steel is inappropriate. *See, e.g.,* 36 Comp.Gen. 718, 721–722 (1957) (only debarment was sought for a violation of the BAA).

## CONCLUSION

 Before imposing a credit against the contract price for a violation of the BAA as a condition to permitting the contractor to use the foreign material, the facts of each case must be examined carefully. The changes clause of the contract may be used as the basis for the credit only where the use of the foreign material lowers the contractor's cost of performance. Similarly, the remedy fashioned by the Comptroller General should be used only where it will clearly serve the purposes which precipitated it. Such an analysis is necessary to ensure that the proposed sanction remedies an actual injustice.

In the instant case, the VA states that the credit is necessary to "negate any unfair advantage" and "deny any benefit" plaintiff may have derived through its violation of the BAA. These bases for the credit, however, are unsupported by the evidence. Where, as here, (1) a waiver is appropriate under the terms of the BAA and has been granted, (2) plaintiff's bid is based on the cost of the foreign material in question, (3) plaintiff's cost of performance is not affected by the waiver of the BAA, and (4) plaintiff's bid would have remained the low bid even if it had been based entirely on domestic materials, imposition of a credit is inappropriate.

For the reasons stated above, plaintiff's motion for summary judgment is GRANTED. Defendant's cross-motion for summary judgment is DENIED, and judgment will be entered for plaintiff in the amount of $108,000.

---

was awarded failed to list on the BAA certificate foreign materials it proposed to use in the project. In examining the situation, the Comptroller General held that acceptance of the bid, which remained the low bid after evaluation under the BAA, was not prejudicial to the other bidders. *Id.* at 146. *See also* 55 Comp.Gen. 168, 170 (1975).

**13.** We offer no opinion as to whether debarment or suspension is appropriate in the instant case.