BLINDERMAN CONSTRUCTION CO., INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 5–87C.

United States Claims Court.

June 29, 1988.

David I. Abse, Warrenton, Va., for plaintiff.

Gordon D. Kromberg, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court after trial on the issue whether the Veterans Administration incurred responsibility for the delay in performance of plaintiff's contract (the duration of any such delay left for further proceedings) by requiring that plaintiff procure and use domestic homogeneous vinyl flooring rather than a nondomestic product.

## FACTS

The following findings of facts derive from the trial and also draw on the parties' joint stipulations.

On December 17, 1982, the Veterans Administration (the "VA") released to the public a bid package containing the Invitation for Bids, plans, and specifications for the remodeling of the Veterans Administration Hospital in Danville, Illinois. The bid package was prepared for the VA by the architect/engineer firm of Graham, Anderson, Probst & White, Inc. ("Graham Anderson"). On February 24, 1983, the VA awarded a fixed-price construction contract for that project to Blinderman Construction Company, Inc. ("plaintiff"). The specifications, conditions, and drawings accompanying the Invitation for Bids in the solicitation package made up the contract documents governing the procedures for the work.

The solicitation package included information on the Buy American Act, 41 U.S.C. §§ 10a to 10c (1982), which provided, in pertinent part:

(a) The Buy American Act (41 U.S.C. 10a–10d) generally requires that only domestic construction material be used in the performance of this contract (see the clause entitled "Buy American" in VA Form 08–3374, General Provisions, Construction Contracts). This requirement does not apply to the following construction material or components: Acetylene, black; antimony, as metal or oxide; asbestos, amosite; bismuth; cadmium, ores and flue dust; chalk, English; chrome ore or chromite; cobalt in cathodes, rondelles, or other primary forms; cork, wood or bark and waste; dammer gum; fiber, coir, abaca, and agave; flax, graphite, natural, crystalline, crucible grade; hemp; jute and jute burlaps; kaurigum; lac; logs, veneer, and lumber from: Alaskan yellow cedar, angelique, balsa, ekki, greenheart, lignum vitae, mahogany, and teak; manganese; mica; nickel, primary in ingots, pigs, shot cathodes or similar forms; nickel oxide and nickel salts; nitroguanidine (picrite); rubber, crude and latex; shellac; sisal; tin, in bars, blocks, and pigs; tungsten; and wax, carnauba.

(b)(1) Furthermore, bids or proposals offering use of additional nondomestic construction material may be acceptable for award if the Government determine[s] that use of comparable domestic construction material is impracticable or would unreasonably increase the cost or that domestic construction material (in sufficient and reasonably available commercial quantities and of a satisfactory quality) is unavailable. Reliable evidence shall be furnished justifying such use of additional nondomestic construction material.

The General Provisions of the contract contained a "Buy American" clause in pertinent part providing:

(a) *Agreement.* In accordance with the Buy American Act ... the Contractor agrees that only domestic construction material will be used (by the Contractor, subcontractors, materialmen, and suppliers) in the performance of this contract, except for nondomestic material listed in the contract.

Section 45B–1 of the contract, which the parties referred to as the "VA Specifica-

tion," called for "Homogeneous Vinyl Flooring" and provided, in pertinent part:

 A. This section includes non-conductive polyvinyl chloride (PVC) sheet flooring and integral coved base.

 B. Colors and patterns of flooring and coved base are specified in section, Color Design.

VA Specification § 45B–2 A. stipulated that the contracting officer was to approve products upon submission of the contractor. Section 45B–3 A. incorporated by reference Federal Specification SS–T–312B entitled "Tile, Floor: Asphalt, Rubber, Vinyl, Vinyl–Asbestos" ("Federal Specification 312B").

VA Specification § 45B–4 called for the following:

 A. Flooring material should be homogeneous polyvinyl chloride (PVC) in sheet form.

 B. Flooring shall meet the requirements of Fed. Spec. SS–T–312, for Type III (vinyl) except as follows:

 1. Flexibility: Material shall permit bending over itself 180 deg. at atmospheric temperature specified without cracking or showing surface damage.

 2. Dimensional stability: Change in linear dimension in either direction shall be less than 0.06%.

 C. Flame spread: When tested in accordance with ASTM:E–84, the flame spread shall be not more than 60.

 D. Pattern, marbilizing and mottling shall extend throughout the thickness.

 E. Flooring shall be in sheet form, maximum sized produced by the manufacturer to provide the minimum number of joints. Minimum size acceptable 36 in. square, ⅛ in. thick. Refer to section, [C]olor Design for special patterns and insets.

Federal Specification SS–T–312B provided in section 3.1.3, in pertinent part: "The vinyl resins shall be a polyvinyl chloride or a copolymer of vinyl chloride not less than 85 percent of which is vinyl chloride...." Section 3.3 governing size provided:

 Unless otherwise specified (see 6.2), the tile shall be 9 inches by 9 inches (228.6 by 228.6 mm) or 12 inches by 12 inches (305 by 305 mm). A tolerance of ± 0.016 inch (0.406 mm) per foot shall be permitted.

VA Specification § 45B–4 E. which allowed for a minimum size of 36 inches square does not conflict with the Federal Specification.

VA Specification § 55 governing "Color Design" provided, in pertinent part:

 55–1. *Scope:* This section contains a coordinated color system in which requirements for materials specified in other sections of this Specification and/or shown on the Drawings, are identified by Veterans Administration color codes for color, texture and pattern.

 55–2. *Manufacturer's* trade names and number used herein identify colors, finishes, textures and patterns. Subject to approval of the Contracting Officer, products of other manufacturers will be considered, provide[d] they are equivalent to the colors, finishes, textures and patterns listed and meet the requirements of the Specifications and Drawings. Following is a list of manufacturers indicated in Paragraph 55–3 with the code letter used for each: ...

Tarkett, of Swedish manufacture, was among those listed. Section 55–3 E. covering "Welded Vinyl Floor and Flash Coving" specified "Homogeneous vinyl flooring" and listed three Tarkett colors and patterns.

On December 21, 1983, almost nine months after the VA issued plaintiff a notice to proceed, plaintiff submitted flooring for approval for use on the project manufactured by Forbo–Forshaga Smaragd ("Forbo"), also a Swedish product. Plaintiff believed that polyvinyl chloride ("PVC") sheet flooring was not manufactured by any domestic manufacturer and that no domestically manufactured product met all the specifications. At that time plaintiff also believed that both Forbo and Tarkett met all the specifications. However, Lyle H. Almasy, an owner of Superior Floors, Inc. ("Superior"), the subcontractor which supplied the flooring to plaintiff, testified that, although he did not prepare the bid, his business records on the subcontract indicated that the project architect ap-

proved Forbo since the flame spread of Tarkett did not meet the specifications. Superior submitted its bid to plaintiff on January 1, 1983, and received its subcontract only incident to plaintiff's December 21, 1983 submittal of Forbo for approval by the VA. Mr. Almasy himself was unfamiliar with the Buy American Act until this subcontract.

By a Return of Submittal dated January 3, 1984, the VA refused to approve the use of Forbo flooring because it was not of domestic manufacture. The Return noted that domestic manufacturers include Flexco, VPI, and Armstrong. On January 20, 1984, plaintiff submitted for approval Medintech, an Armstrong flooring product. On January 31, 1984, the VA approved the submittal for Medintech flooring. Armstrong Medintech flooring is a PVC sheet flooring. Medintech was introduced to the market on June 27, 1983, and thus was not available when plaintiff submitted its bid, but was when plaintiff submitted Forbo to the VA. Since its introduction to the market, Medintech has been of domestic manufacture. Delivery of the Armstrong Medintech flooring started no earlier than March 14, 1984, and was completed by no later than April 11, 1984.

On November 8, 1985, plaintiff submitted a certified claim to the contracting officer for $140,752 and a 94-day time extension (subsequently reduced before trial to 64 calendar days) allegedly arising from the contracting officer's improper disapproval of plaintiff's submittal of Forbo and the delay occasioned by difficulties in timely obtaining sufficient quantities of Medintech. The contracting officer denied the claim on January 7, 1986, and plaintiff commenced suit in this court on January 8, 1987.

## DISCUSSION

Plaintiff's principal contentions are that the VA's rejection of Forbo was improper because the contract specified a foreign product and/or that the specification required use of a nondomestic product since no American-made product could satisfy all the requirements of VA Specification § 45B and Federal Specification 312B.

 1. With respect to its first argument, plaintiff contends that the contract specified through the Color Design section of the VA Specification the use of Tarkett, a nondomestic product. This argument is rejected as a matter of law based on contract interpretation, as well as a matter of fact, since plaintiff's key witness failed to support this theory.

As a matter of contract interpretation, the Color Design section, VA Specification § 55, states that it "contains a coordinated color scheme in which requirements for materials specified in other sections of this Specification and/or shown in the Drawings are identified by Veterans Administration color codes for color, texture and pattern." The materials specified in other sections of the specifications include homogeneous vinyl flooring, as specified in VA Specification § 45B and Federal Specification 312B. Thus, VA Specification § 55 does not pretend to specify a floor covering for other than the limited purposes set forth therein.

Dale Roy, who testified for plaintiff, was the architect associated with Graham Anderson as job captain on this project. His function was to prepare the working drawings and edit the master specifications.[1] On direct examination he testified with reference to the Color Design section, VA Specification § 55, that Tarkett was indicated "just to give a color guideline." Moreover, Mr. Roy stated that the Color Design section was prepared by Graham Anderson's interior designer and that Tarkett was designated because "[i]t was a very strong blue color, which was something

---

1. Mr. Roy acknowledged the limitations to his authority. It was likely Mr. Roy who spoke with Mr. Almasy's employee and approved Forbo. This approval is not decisive, however, since Mr. Roy did not have authority to override the requirements of the Buy American Act as incorporated in the contract; or the minimum size requirements of VA Specification § 45B-4 E.; or the contracting officer's authority to approve submittals pursuant to section GR-1E. of the contract's General Requirements.

that she [the designer] wanted to achieve in the color design."

 2. Defendant has taken the position throughout this litigation that an exception to the Buy American Act must be requested at the time of bid submission. This argument was rejected squarely by the Federal Circuit in *John T. Brady & Co. v. United States*, 693 F.2d 1380 (Fed.Cir. 1982):[2]

> It is true that the Buy American Act, like other statutes requiring award to the lowest bidder, is directed primarily to the period prior to the award. But we find nothing in the Buy American Act ... which requires that exceptions be requested and granted before the contract is awarded. Moreover, there is nothing in the Act ... which prohibits changes to be made in the contract, if necessary, after it has been executed....

693 F.2d at 1385. Reasoning that there will be instances "where domestic material is unavailable or where its price escalates dramatically," *id.* at 1386, the Federal Circuit affirmed the trial court's holding that an exception to the Buy American Act could be granted by the means of a change order. *Id; cf. L.G. Lefler, Inc. v. United States*, 6 Cl.Ct. 514 (1984) (price adjustment in the form of a change order sought on basis of Buy American Act for cost of nondomestic structural steel).

In its January 3, 1984 Return of Submittal rejecting Forbo, the VA suggested three domestic manufacturers: Flexco, VPI, and Armstrong. Plaintiff argued at trial that none of these products or any other domestic product could satisfy VA Specification § 45B and Federal Specifica-

tion 312B. Kenneth J. Chura, who served as project engineer for plaintiff and is now plaintiff's superintendent, was the individual who worked along with Mr. Almasy to obtain the domestic flooring after January 1984. In connection with plaintiff's claim, Mr. Chura prepared a March 12, 1985 analysis of these three products, along with Tarkett and Forbo, against the compositional and performance standards of VA Specification § 45B and Federal Specification 312B. The Chura chart was based solely on Mr. Chura's interpretation of promotional literature, and the witness' forthcoming testimony about the chart revealed errors and incomplete data. For example, Mr. Chura incorrectly posited that PVC surfaces were different from solid vinyl flooring, which would have had the effect of disqualifying Medintech.[3] He also regarded Forbo as a homogeneous flooring although it is a layered product. The chart further assumed that a product failed to meet certain criteria if its promotional literature did not mention a particular characteristic, such as the flexibility and dimensional stability of VPI and Flexco. With the exception of several specification requirements, the Chura chart concluded that the nondomestic products would have fulfilled most of the requirements of the specifications, but the chart does not establish that the domestic products did not fulfill the contract requirements.

Plaintiff's expert in resilient floor covering, Clayton Johnson, was also offered to establish that no nondomestic flooring, as specified by the contract, was available in 1983 and 1984. Mr. Johnson's knowledge of manufacturers was limited to those in

---

**2.** Neither defendant nor plaintiff cited the *Brady* case to the court. Defendant was obligated to do so. Authority contrary to a party's position always must be cited to the court. Model Rules of Professional Conduct Rule 3.3(a)(3) (1988) comment ("[A]n advocate has a duty to disclose directly adverse authority in the controlling jurisdiction which has not been disclosed by the opposing party...."); *see In Re Oximetrix, Inc. v. United States*, 748 F.2d 637, 643 (Fed.Cir. 1984) (Markey, C.J.) (order denying petition for writ of mandamus) (citing Model Rule 3.3(a)(3), court criticizes counsel for ignoring Supreme Court case "most closely on all fours with the present case").

**3.** At trial plaintiff conceded that this was an erroneous assumption. The error is significant since it formed the primary basis of plaintiff's November 8, 1985 claim to the contracting officer. None of the other alleged disqualifying characteristics cited in the Chura chart were presented, despite the fact that the chart was created six months earlier. Plaintiff's failure to present the other information contained in the chart, until abandonment of what had been its basis for a change proposal, suggests that plaintiff already was aware that the chart's methodology was weak.

the Chicago area that "called on us," and he admitted, after defense counsel questioned him about several different manufacturers, that "there could have been a thousand" other manufacturers producing flooring during the early 1980's with which he may not have been be familiar.

■ 3. Plaintiff also argued that the contract was ambiguous and that the ambiguity should be resolved in its favor. The standards governing this legal doctrine are set forth in *John C. Grimberg Co. v. United States*, 7 Cl.Ct. 452, 456 (1985), *aff'd mem.*, 785 F.2d 325 (Fed.Cir.1985). The court's first responsibility in a case such as this, "is to ascertain analytically whether *vel non* an ambiguity existed." *Enrico Roman, Inc. v. United States*, 2 Cl.Ct. 104, 106 (1983). When Mr. Roy edited the master specifications, he intended that sheet flooring should be used. In his view sheet flooring had fewer seams and would offer a better installation for utilization in operating rooms, since bacteria infestation in seams would be minimized. Mr. Roy reviewed the manufacturing information for Tarkett at the time the specification was assembled and was of the view that no domestic material met the specification that he drafted. Acknowledging that the VA was responsible for final review and approval of the specification, Mr. Roy testified that the master specification had specified a rolled sheet and that he intended to revise it to call for tiling that came in a sheet, although not a rolled sheet. However, the specification as finally promulgated, VA Specification § 45B–4 E., specified that flooring should be in sheet form with a minimum acceptable size of 36 inches square. Mr. Roy seemed taken aback that the final VA Specification § 45B–4 E. somehow had adopted a 36–inch minimum width requirement. This has import, because several domestic tiles available at contract award satisfied the minimum size, although they did not come in widths of 6 feet, which is the form in which Tarkett and Forbo were manufactured.

The ambiguity that plaintiff seeks to elicit is based on the requirement that "[f]looring shall be in sheet form" and the 36–inch square minimum size. Plaintiff supports its argument by a drawing of the fifth floor that describes size 6–by–6–by–11 foot floor inserts in operating rooms. Mr. Johnson who, according to plaintiff's counsel "didn't have a good day," testified that this notation on the drawing indicated that the contractor "could make it up with any size you wanted to." Mr. Roy was of a different view, since he intended that sheet flooring with the fewest seams be used and intended to specify a minimum width corresponding to Tarkett's 6–foot sheeting, although for some reason his testimony was not sought with respect to this specific drawing. In any event, Mr. Johnson testified that the 36–by–36 size stipulation got the VA "off the hook." Even though Mr. Roy testified that tile measuring 36–by–36 inches was not sheet tile, he agreed on cross-examination that sheet flooring is flooring that is not poured on site. The testimony of these witnesses, taken together, does not substantiate the existence of an ambiguity.

Plaintiff's Vice President in Charge of Project Engineering, Leland J. Scherkenbach, a professional civil engineer, took the position that since VA Specification § 45B called for sheet floor tiling, the applicable Federal Specification was L–F–475a "Floor Covering Vinyl Surface (Tile and Roll), with Backing" ("Federal Specification 475a"). This specification qualified size, as follows: "Vinyl roll material with backing is commercially available in rolls 6 feet wide." The problem with this evidence was that it did not persuade. One difficulty is that VA Specification § 45B–4 D. calls for homogeneous flooring with pattern, marbilizing, and mottling extending throughout the thickness. Federal Specification 475a covers tile with backing. Another problem was that Messrs. Johnson and Roy did not testify that Federal Specification 475a was appropriate. Indeed, they did not comment on this subject. These two witnesses had no difficulty giving their testimony within the confines of VA Specification § 45B and Federal Specification 312B. Thus, the court cannot conclude as a matter of contract interpretation—enlightened by findings based on witness testimony and other

evidence—that the contract was ambiguous.

Even if the language were deemed ambiguous, the court would be required to find that plaintiff's interpretation was reasonable, *i.e.*, that the provision requiring sheet flooring, in conjunction with Mr. Roy's testimony, overrode the requirement that a minimum size could be 36 by 36 inches. The contract language does not support the reasonableness of plaintiff's inference. Although it may have been what Mr. Roy intended, Mr. Johnson did not read the contract, including the contract drawings, as calling for sheet flooring in larger widths than 36 inches. He reconciled the putatively ambiguous language as calling for a minimum width of 36 inches.

## CONCLUSION

Plaintiff has failed to prove by a preponderance of the evidence that the contract specified a nondomestic material; or that the contracting officer's decision that domestic flooring meeting the contract specifications was not unavailable was unreasonable, arbitrary, or capricious; or that the contract was ambiguous. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No costs.

