949 F.2d 402
 37 Cont.Cas.Fed. (CCH) P 76,188
 NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
TGS INTERNATIONAL, LTD., Appellant,
v.
The UNITED STATES, Appellee.
 No. 90-1440.
 United States Court of Appeals, Federal Circuit.
 Oct. 8, 1991.
 
 Before RICH, PAULINE NEWMAN and ARCHER, Circuit Judges.
 PAULINE NEWMAN, Circuit Judge.
 
 
 1
 TGS International, Ltd. appeals the decision of the Armed Services Board of Contract Appeals[1] affirming in part a contracting officer's decision denying TGS's claims for certain adjustments. We affirm in part, reverse in part, and remand.
 
 OPINION
 
 2
 Appeal is taken under the Contract Disputes Act, 41 U.S.C. §§ 601 et seq. Review of the Board's decision is governed by 41 U.S.C. § 609(b). A decision on a question of fact
 
 
 3
 shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.
 
 
 4
 41 U.S.C. § 609(b). The appellate tribunal must decide questions of law for itself, John T. Brady & Co. v. United States, 693 F.2d 1380, 1384 (Fed.Cir.1982) (no finality attaches to the Board's conclusions of law); although the Board's interpretations of law are carefully considered, Erickson Air Crane Co. of Washington, Inc. v. United States, 731 F.2d 810, 814 (Fed.Cir.1984).
 
 
 5
 The contract between TGS and the Naval Facilities Engineering Command was for the design and construction of a warehouse and supply project at the Ali Al-Salem Air Base in Kuwait. TGS concentrates this appeal on four areas that it states were subject to government-caused (generally the Kuwait government) delays that affected TGS's costs and time of performance: (1) delivery of two man-lifts known as Demag Pickers; (2) delivery of caulking; (3) customs' delays of electrical equipment and materials; and (4) delays in providing full electric power. Increased labor costs are claimed under the War Risks clause. TGS emphasizes that in this tightly audited contract there was no flexibility to accommodate contingencies, and that its increased costs of performance merit equitable and legal adjustment.
 
 I. Delay Damages
 
 6
 The contract provided that the Kuwait government "shall deliver" certain listed property "at the times and locations stated [in the schedule]", and that "if not so delivered ... the Contracting Officer shall ... if the facts warrant such action, equitably adjust any affected provisions ... pursuant to the procedures of the 'Changes' clause." Although the government (the United States is representing all government interests in this litigation) argues that the government can not be liable under this clause because specific delivery dates were not included in the schedule, when delivery dates are not specified the delivery must be within a reasonable time in view of the circumstances of the contract. See Commerce Int'l Co. v. United States, 338 F.2d 81, 87 (Ct.Cl.1964) (government's obligation measured "by the reasonable expectations of the parties in the special circumstances in which they contracted").
 
 1. The Demag Pickers
 
 7
 The Board acknowledged the delay in delivery of two Demag Pickers, for reasons outside of TGS's control. TGS argues that the late delivery of the two Pickers affected the cost of performing the rewarehousing in Building 18-2. The Board found that "TGS's job progress was not impacted", due to concurrent delays that were the responsibility of TGS and because the building was accepted with the pickers as a punch list item. This finding, which depended in part on the evaluation of evidence including the credibility of witnesses, will not here be disturbed. See Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549, 552 (Fed.Cir.1984) (credibility of witnesses is left to trier of fact). We affirm the Board's decision on this issue.
 
 2. Caulking
 
 8
 Due to a series of mishaps and errors, none caused by TGS, caulking material to seal the Butler Stone panels, initially ordered on June 19, 1984, did not arrive until April 4, 1985. TGS states that the delay in receipt of the caulking material necessitated the extra step of cleaning out sand and dirt that wind storms had blown into the cracks, delayed the acceptance of the building, and caused other inefficiencies such as the need to twice erect scaffolding.
 
 
 9
 The Board found that "the confusing state of the present record prevents us from assigning fault for this delay", and also that the issue was moot for lack of impact upon TGS's work effort. The Board erred in weighing the issue of fault against TGS, for whether or not the reasons could be precisely identified, it was clear that the delivery delays (for example, the disappearance of the first shipment) were out of TGS's control. However, the Board's ruling that TGS did not establish impact must be sustained, for there was substantial evidence of concurrent delay attributable to TGS in other areas. The general rule regarding concurrent delay is that:
 
 
 10
 Where both parties contribute to the delay "neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party."
 
 
 11
 Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed.Cir.1982) (quoting Coath & Goss, Inc. v. United States, 101 Ct.Cl. 702, 714-15 (1944)). The Board found that the project had suffered significant delays caused by TGS, manifested particularly in the structural steel shipments. This finding is supported by substantial evidence and must be sustained thus defeating recovery by TGS of the asserted additional cost of performance. However, in accordance with Blinderman, liquidated damages for this period of delay shall be remitted.
 
 3. Electrical Materials
 
 12
 TGS states that certain critical air shipments of electrical equipment and materials were unreasonably delayed by Kuwait customs authorities, thereby delaying completion. Also involved were prolonged periods of shipping and delivery and customs delay in the switchgear, magnesium backfill, and some other items. Although the Board recognized that the delays were due to Kuwait shipping and Kuwait customs, we affirm that TGS did not meet its burden of establishing the impact of these delays, in the context of TGS's contributions to delay. Thus we sustain the Board's rejection of delay and impact damages on these premises.
 
 4. Switchgear and Activating Full Power
 
 13
 TGS states that for a period of four months after its completion the electric substation was erroneously not accepted and full power was erroneously withheld by the Kuwait authorities. The government argues that the Kuwait authorities acted reasonably in delaying acceptance of the substation and meanwhile withholding full power. While the government is entitled to a reasonable time to review the contractor's work product, when the government erroneously rejects the product the government is not entitled to liquidated damages for the delay thus caused, and the contractor is entitled to recover its increased costs due to the delay. See C.W. Schmid v. United States, 351 F.2d 651, 655-56 (Ct.Cl.1965) ("where government-caused delays force the contractor into more costly operations, the government will have to respond in damages for the resulting additional outlays") (quoting J.H. Hedin Constr. Co. v. United States, 347 F.2d 235, 253 (Ct.Cl.1965)).
 
 
 14
 The substation was eventually accepted as built, and it is no longer disputed that TGS complied with the contract specifications, and that ground fault was not required by the contract. It is not controlling that TGS at first tried to meet the newly raised ground fault objection. We take note that a memorandum from Major Zafar to the Navy, dated two weeks after the substation had been ordered by TGS, was not provided to TGS, and that the possible issue of ground fault was not mentioned to TGS although other changes recommended in the Zafar memorandum were made. TGS was not informed of the concern for ground fault until November, 1984, after the substation was installed. Further, no explanation has been offered for the two months' additional delay by the Kuwait authorities in determining that the substation as built complied with the Kuwait Electrical Code. There is not substantial evidence supporting the Board's assignment of fault for these delays to TGS.
 
 
 15
 The Board's decision with respect to liability for these four months of delay is reversed. We remand for determination of quantum, including increased costs due to the lack of full power. In addition, liquidated damages due to this delay shall be remitted.
 
 II. War Risks
 
 16
 TGS sought recovery under the War Risks clause for increased labor costs due to the May-June 1984 proximity of hostilities in the Iran-Iraq war. The War Risks provisions were comprehensive, and made clear that the contractor was not intended to bear, inter alia, increased costs due to "hostilities or threat of hostilities affecting the supply or movement of materials, supplies and/or personnel". The government's argument that TGS knew of the Iran-Iraq hostilities when the contract was entered into does not absolve the government of its contractual obligation with respect to increased costs. The only question is whether the increased labor costs that were experienced were fairly attributable to the war.
 
 
 17
 The Board referred to evidence "tending to show" that eleven of TGS's skilled laborers might have left Kuwait because of "war jitters", but held that TGS had not proven that this was the primary reason for their departure. TGS argues that the correct legal standard is whether the war was a substantial factor, rather than the primary factor, in the increased labor costs, for both replacement of personnel and the five percent pay raise that TGS granted at the time of the employee unrest that arose when the war came into view forty miles away. The War Risks clause is broadly stated, and on these facts was satisfied when the war became a substantial factor in increased labor costs. That the remaining personnel were apparently quieted by the five percent pay raise does not mean that the War Risks clause does not apply; it simply put a price on the increased risk at that stage of the encroaching war. The government does not assert that TGS's action was unreasonable in view of the circumstances that prevailed.
 
 
 18
 We have carefully considered the Board's application of the War Risks provision. On the Board's finding with respect to the eleven employees who left, and applying the correct standard to the pay raise, we conclude that TGS is entitled to recover these costs under the War Risks clause. We remand for review of quantum.
 
 Costs
 
 19
 Costs to TGS.
 
 
 20
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 TGS Int'l, Ltd. v. United States, ASBCA No. 35295, 90-2 B.C.A. (CCH) 22,891 (March 29, 1990)