## GEORGE HYMAN CONSTRUCTION COMPANY

v.

## The UNITED STATES.

### No. 61–76.

United States Court of Claims.

Oct. 19, 1977.

---

Matthew S. Perlman, Washington, D. C., atty. of record for plaintiff. William W. Goodrich, Jr. and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. Barbara A. Babcock, Washington, D. C., for defendant.

Before DAVIS, Judge, SKELTON, Senior Judge, and NICHOLS, Judge.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

SKELTON, Senior Judge, delivered the opinion of the court:

█ The plaintiff, George Hyman Construction Company (contractor or plaintiff), entered into contract No. GS–00B–01214 on June 30, 1972, as contractor with the General Services Administration of the United States Government (the Government or defendant), for the construction of Phase I of the United States Tax Court Building in Washington, D. C., for the sum of $13,228,-000. During construction a dispute arose between the contractor and the Government with reference to the construction of eight utility lines, namely the storm and sanitary sewer, water service, steam and condensate return lines, which are shown on drawing No. 9–0S–1, designated "Site Utility Plan." These lines ran underground to existing lines of the same kind, two of which ran to the wall of the Labor Department Building, all of which are shown on the above drawing. The contractor took the position that it was only required to "stub-out" the utility lines a distance of five feet from the building as shown on drawing 9–P–1, designated "Basement Floor Plan-Plumbing," and was not required to construct and install the utility lines to the existing lines of the same kind outside the building, two of which entered the nearby Labor Department Building. The Government contended that the contractor was required by the contract to construct the utility lines to the existing lines and to the Labor Department Building, as aforesaid. The contracting officer ordered the contractor to so construct the lines, which it did, but it claimed this was a constructive change order not covered by the contract and that it was entitled to an equitable adjustment. It filed a claim to that effect with the contracting officer, who denied the claim. The contractor appealed to the GSA Board of Contract Appeals (Board), which heard the appeal and denied the contractor's claim in GSBCA–

3722 on January 23, 1974, 74–1 BCA ¶ 10,-451, with one member of the Board dissenting. The contractor has appealed from the Board's decision to this court under the Wunderlich Act, 41 U.S.C. §§ 321, 322, claiming that the decision of the Board is arbitrary, capricious, unsupported by substantial evidence, and is erroneous as a matter of law. The Government says that the decision of the Board is correct and should be affirmed. The case is before the court on cross-motions for summary judgment. We have concluded that the law and the facts do not support the contractor's claim, and we hold for the Government.

The facts show that in the beginning the Government intended to construct the Tax Court Building under one contract, but before issuing the invitation for bids, the plan was changed so as to have the building constructed by two contracts designated "Phase I" and "Phase II." When the plaintiff noticed these designations on the drawings, it made inquiry on June 9, 1972, of the GSA as to their meaning. The GSA responded by amending the special conditions of the contract on June 13, 1972, by adding to section 0110 a new paragraph 1.2 immediately after paragraph 1.1 as follows:

> 1.2 A separate contract designated as Phase II will be awarded to complete the United States Tax Court Building project. The Contractor for Phase I construction shall provide access to the site for the Phase II Contractor without additional cost to the Government or charge to the Phase II Contractor. He shall cooperate with the Phase II Contractor and with the contractor for subway construction to coordinate and execute the work properly.

On June 20, 1972, amendment No. 4 to the invitation for bids was added to new paragraph 1.2 as follows:

> Any reference to Phase I means contract requirements of GS–00B–01214.

Being satisfied with the reply of the GSA, the contractor submitted its bid and was awarded the contract (No. GS–00B–01214) on June 30, 1972, after which it began construction.

As stated above, during construction the contracting officer ordered the contractor to install the eight utility lines above-described and connect them with existing lines of the same kind which were located outside the foundation walls of the Tax Court Building. The contractor took the position that it was only required to "stubout" the utility lines five feet from the building as shown by drawing No. 9–P–1. It contended further that architectural drawing 2–1 and other architectural drawings contained notations such as "Limit Phase I Construction @ Face of Building" and other notations of like import, and the contractor argued that these drawings indicated that it was only required to do the work of Phase I within the confines of the four walls of the building and any work outside of the building was to be performed by the contractor who was to work on Phase II of the building. Consequently, the contractor contended that it had no duty or obligation to construct and install the utility lines in question so that they would connect with existing lines outside of the building, and that such work was to be done by the Phase II contractor. The contracting officer disagreed and required the contractor to connect the utility lines with those existing outside the building. The contractor appealed from the decision of the contracting officer and exhausted its administrative remedy when it received an adverse decision from the Board, and the case is now before us for review under the provisions of the Wunderlich Act.

The contractor makes an ingenious argument, but the controlling facts do not support its position. The contract specifications and drawings make it abundantly clear that the contract required the contractor to install the utility lines so that they would connect with existing lines outside of the Tax Court Building.

Specifications section 0110, "Special Conditions," clause 1, "General," paragraph 1.1 provides in full:

> 1.1 Requirements of the contract include furnishing all labor and materials and performing all work for construction

of United States Tax Court Building, Second Street Northwest between D & D Streets [sic], Washington, D. C., including all changes and repairs incident thereto, as specified and as shown on Drawings No. 0–1, 1–1 through 1–4, 2–1, 2–2, 3–1 through 3–7, 4–1 through 4–5, 5–1 through 5–25, 7–1 through 7–15, 9–0S–1, 9–ME–1, 9–ACH–1 through 9–ACH–15, 9–P–1 through 9–P–10, 9–E–1 through 9–E–22 (all numbers inclusive) and the listed Standard Details and noted modification thereto.

This section of the specifications is crucial to a decision of this case. It will be noted that the contractor is required to furnish all labor and materials and to perform all work as specified and shown on drawings "9–0S–1" and "9–P–1" and the other enumerated drawings. The contractor relies on drawing 9–P–1, which is the basement floor plan that shows the utility lines extending five feet from the sides of the building. The Government relies mainly on drawing 9–0S–1, which is the site utility plan that shows in great detail the required construction of the utility lines so that they connect with existing utility lines of the same kind, two of which enter the nearby Labor Department Building. A reduced copy of the relevant and pertinent parts of drawing 9–0S–1 is attached to the end of this opinion as an appendix.

It will be observed, and we conclude, that drawings 9–P–1 and 9–0S–1 do not conflict and neither drawing contradicts or is inconsistent with the other. In fact, they could be said to be complementary. The contractor was required to furnish the labor and material and perform the work specified on *both* drawings. Drawing 9–P–1 required it to extend the utility lines five feet from the building, and drawing 9–0S–1 required it to extend and connect the utility lines to existing lines of like character outside of the Tax Court Building.

The argument of the contractor that the work of installing the utility lines so that they would connect with existing lines was the obligation of the Phase II contractor is refuted by section 0110 of the specifications quoted above that requires plaintiff to comply with drawing 9–0S–1, which drawing has printed thereon in bold letters the following:

CONTR. NO. GS–00B–01214

This is the contract involved here. Therefore, the installation of the utility lines called for in that drawing was a part of the present contract and required performance by the plaintiff and not by some future contractor of Phase II.

The contractor's argument that it was only required to do the work within the four walls of the building because of the notation on some of the drawings that stated "limit Phase I construction at the face of the building," and other similar notations, is refuted by the fact that drawing 9–0S–1 does not contain any such notation, and, in fact, does not even mention Phase I or Phase II. Furthermore, section 1501, clause 11, paragraph 11.1 provides specifically that any "limit of contract" lines or similar general limits that may appear on the site or other drawings shall not be deemed to apply to the mechanical work on utility lines between building and points of connection. The provisions of this part of section 1501 are as follows:

1. APPLICABILITY

1.1 This section applies to all mechanical and electrical work, including materials and equipment, and is subject to the requirements of the "General Provisions," "General Conditions," and "Special Conditions" sections of this specification.

\* \* \* \* \* \*

11. OUTSIDE SERVICES

11.1 Underground and overhead mechanical and electrical services shall be provided complete to and between building and points of connection to utility lines, etc., as shown on drawings and specified under other sections of this specification. Any "Limit of Contract" lines or similar general limits that may appear on site or other drawings shall not be deemed to apply to the foregoing mechanical and electrical work.

It is clear that this section of the contract provided an exception to the "limit of contract lines to the face of the building" re-

lied on by the contractor and required it to construct the utility lines to points of connection with existing lines outside the four walls of the building.

There are a number of other provisions of the contract that persuade us to conclude that the contractor was required to construct the utility lines so as to connect with existing lines outside of the building, and that its work was not confined to the area inside the four walls of the structure. For instance, paragraph 2 of the "General Provisions," form 23–A, provides in pertinent part, as follows:

Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern.

This paragraph obviously makes the work shown on drawing 9–0S–1 required work, irrespective of plaintiff's interpretation of the specifications.

Paragraph 20.b. of section 1564 provides as follows:

b. Excavate trenches of sufficient width for proper installation of conduit systems and grade bottom of trenches evenly so the conduit will have a solid bearing for full extent of the conduit installation. Excavate rock to a uniform grade 3 inches below conduit. Refill all cut below trench grade with sand firmly compacted.

This paragraph indicates that the contractor should install the conduit systems, because it would not have been practical nor logical for it to excavate the trenches and prepare them for the conduits if some other contractor was to install them.

Paragraph 22 of section 1564 describes and provides for manholes that are located outside the building. The construction and location of these manholes are shown in detail on drawing 9–0S–1 which, as set forth above, was a part of plaintiff's contract. This drawing shows the steam and condensate lines going through the manholes. All of this work was clearly the obligation of the plaintiff and not that of some future contractor.

Paragraph 32 of section 1564 provides that "cathodic protection shall be provided for the steel conduit systems furnished under this specification." A note on drawing 9–0S–1 states in part: "provide cathodic protection * * * see specifications." There would not have been any need to require the plaintiff to provide cathodic protection for steel pipes unless he was to install them. If the pipes were not there and were to be put in place later on by a future contractor, the above requirement would have been useless, as the plaintiff could not provide this protection to pipes he did not have.

Section 1570 is captioned "Heating Apparatus." Paragraph 1.1 provides that this section of the specification "includes the installation of a complete steam distribution and hot water heating system for the building as described herein and indicated on the drawings, and is subject to the requirements of the 'Mechanical and Electrical Equipment, General Requirements' section of this specification." The contractor obviously could not install complete systems if there were no underground steam pipes and water pipes running to the existing underground supply pipes supplying the steam and water, as shown on drawing 9–0S–1.

Section 1517 is entitled "Plumbing." Paragraph 1 provides that this section of the specification "includes the furnishing and installation of complete drainage, water supply and fire protection systems, etc., as described herein and indicated on the drawings, and is subject to the requirements of the 'Mechanical and Electrical Equipment, General Requirements' section of this specification."

Paragraph 5.1 provides that connections to street sewers shall be in accordance with local regulations. Paragraph 6.1 provides that sanitary and storm drain lines outside the lot lines shall be constructed in accordance with local regulations. Paragraph 16 relates to water piping and paragraph 16.1 provides that, outside the lot lines, the piping shall be in accordance with the local water authority regulations.

These paragraphs of section 1517 show clearly that work was required outside of

and beyond the face of the Tax Court Building, that plaintiff was required to furnish the underground utilities involved herein. For example, paragraph 5.1 refers to connections to street sewers; such sewers are shown on drawing 9–OS–1 and plaintiff clearly was required to carry the pipes to those sewers. Its position that its work stopped at the face of the building, with the piping extending only five feet, is without support in the facts.

Paragraph 31.1 of the "Special Conditions" provides that the contractor shall "obtain all necessary permits in public space for the construction of utility lines." It would be extremely unusual and illogical to require the contractor under this contract to obtain permits for the construction of utility lines to be installed by some other contractor unknown to it. Yet, this results from the position the plaintiff asserts in this suit.

Paragraph 38 of section 0110 is captioned "Survey of Outside Utility Lines." Paragraph 38.1 provides, in pertinent part, as follows:

> 38.1 Upon completion of the building, the Contractor shall furnish to the Contracting Officer for approval an acceptable and accurately dimensioned survey showing the location and elevation of all utility lines (water, gas, electric, sewer, steam, etc.) including valves, connections and changes in direction, as installed under the contract, within the property lines and outside the building walls * * *. Points where utility lines leave the property shall be located from lot monuments.

It would not be logical to require the contractor to furnish a survey showing location and elevation of utility lines about which it knew nothing and for which it had no responsibility (i. e., which, according to plaintiff, were to be furnished under another contract by a contractor unknown to plaintiff).

Paragraph 42 of section 0110 is entitled "Work Outside of Property Lines." Paragraph 42.1 states as follows:

> 42.1 Work outside of property lines, including repair, replacing and furnishing

of streets, sidewalks, gutters and curbs cut in performance of underground work, is to be done in accordance with applicable codes and/or ordinances.

It would be illogical for the specifications to provide, as here, that work outside the property line (which is more than five feet from the walls of the building), and specifically "underground work," is to be done in accordance with certain codes if under the contract the contractor had no such work to perform.

We conclude from these contract provisions and drawings that the plaintiff was required to install the eight underground utility lines involved here and to connect them with existing lines of the same kind outside the walls of the Tax Court Building, as shown on drawing 9–OS–1.

The plaintiff contends that an ambiguity exists in the specifications and drawings and that its interpretation of their meaning is reasonable. Under these circumstances, the plaintiff invokes the doctrine of *contra proferentem,* which requires the ambiguity to be resolved against the drafter of the contract (the Government here), citing *WPC Enterprises, Inc. v. United States,* 323 F.2d 874, 163 Ct.Cl. 1 (1963). We reject this argument for several reasons. The interpretation of a contract is a question of law for the court to decide and an administrative interpretation of a contract is not binding on the court. *See Merando, Inc. v. United States,* 475 F.2d 598, 599, 201 Ct.Cl. 19, 21 (1973); *Tri-Cor, Inc. v. United States,* 458 F.2d 112, 122, 198 Ct.Cl. 187, 204 (1972); *Martin Lane Co. v. United States,* 432 F.2d 1013, 1014–15, 193 Ct.Cl. 203, 206–07 (1970); *Mountain Home Contractors v. United States,* 425 F.2d 1260, 1264, 192 Ct.Cl. 16, 23 (1970). However, a Board's interpretation of a contract will be given careful consideration and accorded great respect. *See Dale Ingram, Inc. v. United States,* 475 F.2d 1177, 201 Ct.Cl. 56 (1973); and *Winston Brothers Co. v. United States,* 458 F.2d 49, 198 Ct.Cl. 37 (1972). That has been done in this case. The Board's interpretation of the contract was correct and we approve it.

■ The rule relied on here by the plaintiff that if there is an ambiguity in the contract, and the interpretation of both parties is reasonable, the court will construe and resolve the ambiguity against the drafter of the contract, is not applicable in this case. We interpret the contract, when considered as a whole, including the specifications and drawings, to be clear and unambiguous. Under these circumstances, the plaintiff's interpretation of the contract is unreasonable. Furthermore, if plaintiff's interpretation is carefully analyzed, it is apparent that the presently claimed ambiguity arises from its argument that drawing No. 9–P–1 and other architectural drawings are in direct conflict with drawing No. 9–OS–1 and the various specifications and contract provisions discussed in detail above. Had the plaintiff believed this to be so before it submitted its bid, the alleged ambiguity would have been a patent one which imposed a duty on the plaintiff to make inquiry of the contracting officer before it submitted its bid as to the meaning of the ambiguous discrepancies. This is a well established rule. *See Merando, Inc. v. United States, supra; Space Corp. v. United States,* 470 F.2d 536, 538, 200 Ct.Cl. 1, 5 (1972); *Bishop Engineering Co. v. United States,* 180 Ct.Cl. 411, 415 (1967); *Blount Brothers Construction Co. v. United States,* 346 F.2d 962, 972–73, 171 Ct.Cl. 478, 496 (1965); and the cases cited in the foregoing cases. The plaintiff made no such inquiry and in no way called to the attention of the contracting officer the discrepancies and conflicts it is now claiming before it submitted its bid. The general inquiry as to the meaning of the terms "Phase I" and "Phase II" on the drawings it made to the contracting officer in its letter of June 9, 1972, was not a sufficient inquiry as to the alleged discrepancies and conflicts it is now claiming and which it asserted for the first time after it was awarded the contract and had started construction. The failure of the plaintiff to make such an inquiry forecloses its attempt to invoke the ambiguity rule now.

We hold that the directive of the contracting officer of September 19, 1972, ordering the plaintiff to install the utility lines in question and connect them with existing lines of the same kind outside the walls of the Tax Court Building was not a constructive change order and the plaintiff is not entitled to an equitable adjustment by reason thereof.

■ The plaintiff says that it is the practice of the trade in the construction industry for contractors to install five-foot exterior utility line connections at the face of a building, and that this practice in the trade supports its position here. We do not agree. A trade practice cannot prevail over unambiguous provisions of a contract such as we have in the instant case. The question is what is required under the terms of the contract. *See Merando, Inc. v. United States,* 475 F.2d 603, 604, 201 Ct.Cl. 28, 31 (1973); and *S. S. Silberblatt, Inc. v. United States,* 433 F.2d 1314, 1323–24, 193 Ct.Cl. 269, 288 (1970), and cases cited. The trade practice theory is of no help to the plaintiff in this case.

We hold further that the decision of the Board is neither arbitrary nor capricious and is supported by substantial evidence and is entitled to finality under the provisions of the Wunderlich Act. We find no error of law in the decision of the Board and it is approved.

The defendant's motion for summary judgment is granted, plaintiff's cross-motion is denied, and plaintiff's petition is dismissed.

DAVIS, Judge, concurring:

I agree with Judge Skelton's opinion except that I do not think that the relevant parts of the contract were plain and unambiguous on their face. There was, in my view, a surficial conflict between the two drawings which is properly resolved, as Judge Skelton does very thoroughly, by considering the contract as a whole in all its aspects and parts. The rule that ambiguity works against the drafter is more than neutralized in this instance by the companion canon applicable to a patent and glaring ambiguity or discrepancy. On the whole case the plaintiff cannot prevail.

Appendix to follow.

APPENDIX

APPENDIX—Continued

