SHUEY AIRCRAFT, INC.

v.

The UNITED STATES.

No. 598–82C.

United States Claims Court.

Sept. 7, 1983.

Lawrence Kritzer, Inglewood, Cal., for plaintiff.

Marsha D. Peterson, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

## OPINION

HARKINS, Judge:

Plaintiff's complaint, filed November 22, 1982, involves review of a decision of the Armed Services Board of Contract Appeals (ASBCA or Board) under the Claims Court Tucker Act jurisdiction and Wunderlich Act standards.[1] The contract involved, made in 1972, is not subject to the Contract Disputes Act of 1978.[2] Pursuant to order on January 27, 1983, the administrative record was filed on February 25, 1983, and the parties have filed cross-motions for summary judgment. Without oral argument, for reasons that follow, defendant's motion is allowed, plaintiff's motion is denied, and the complaint will be dismissed.

Plaintiff does not challenge any of the Board's findings of fact as lacking the support of substantial evidence. The facts essential for judgment are not in dispute.

The contract was for a negotiated fixed price on standard forms to supply 1,461 fill tube retainer assemblies (P/N 636895) at a unit price of $4.50, and an aggregate price of $6,574.50. A fill tube retainer assembly is a hollow copper tube, 8 inches long, brazed to a brass head with a 90 degree elbow; it is used as part of a G–200 gyroscope. The fill tube retainer assembly had been developed by Litton Systems, Inc., which, prior to plaintiff's contract, had supplied the item. Government furnished drawings and specifications in plaintiff's contracts were made by Litton Systems.

Under a previous contract awarded August 12, 1971, plaintiff had supplied 8,830 of the same item to the Air Force at a price of $2.77 each, and an aggregate price of $24,459.60. Plaintiff delivered the 8,830 pieces in January 1972, and those pieces were passed by defendant's quality assurance representatives. In May 1972, plaintiff was told that approximately 1,600 pieces had defects that made them unacceptable. At plaintiff's request, a research laboratory investigated the problem and reported on June 22, 1972, that contaminating material on the inside of the tubes was copper oxide of a form that "should be easily removed by liquid honing." Plaintiff furnished the laboratory report to the Air Force on July 10, 1972, and offered to rework the parts for additional compensation. This offer was not accepted.

Plaintiff submitted its proposal for the subject contract in September 1972, and the contract was awarded on October 3, 1972. In April 1973, the 1,600 parts rejected under the previous contract were sold to plaintiff at scrap value.

Two proposals were submitted in response to the RFP for the subject contract. Plaintiff's proposal was at $4.50 per unit, and the other, by Litton Systems, Inc., was at a unit price of $10.17. Plaintiff was not asked to verify its bid, and no inquiry was made concerning the difference between the prices, prior to award to plaintiff.

Plaintiff's deliveries were delayed by contamination problems, and a 10-day show cause letter pursuant to the default clause was issued on February 7, 1973. Plaintiff's efforts to overcome the contamination problem produced a new cleaning procedure for rework of the pieces rejected in the previous contract and the development of its own cleaning process, Shuey Process No. 1000, in the subject contract. Plaintiff's claim is for an equitable adjustment under the Changes clause to compensate for additional work resulting from defective specifications.

■ Plaintiff's claim for additional compensation for development and use of its Shuey Process No. 1000 rests on the contention that contract drawings and specifications were defective because they did not specify in detail the manufacturing process

---

1. 28 U.S.C. § 1491(a) (1982); 41 U.S.C. §§ 321–22 (1976).

2. 41 U.S.C. §§ 601–13 (Supp. V 1981). The contracting officer's adverse decision was appealed to the ASBCA on Nov. 29, 1978, and the Board's decision was dated Oct. 17, 1980. (*Appeal of Shuey Aircraft, Inc.,* ASBCA No. 23477, 80–2 BCA ¶ 14,776).

to be used in removal of contaminants. Interpretation of a contract is a question of law that under Wunderlich standards is for the court to decide; the administrative interpretation is not binding.[3] The Board's interpretation, however, is entitled to careful consideration and accorded due respect if not unreasonable.[4]

The Board, after examination of the applicable drawings and notes, determined plaintiff was free to choose the method for cleaning the end item, and was responsible for selection of the means to achieve the required surface conditions. The Board's construction of the contract drawings and instructions is reasonable and is accepted.

The two drawings, with related notes, provided specifications for surface conditions required for completed retainer assemblies, but they did not specify the production process for removal of contaminants. One drawing (636895) provided that the completed fill tube retainer assembly was to meet the following standards: "FREE OF CORROSION PRODUCTS, OXIDES, FLUX RESIDUE & OTHER FOREIGN MATERIALS WHEN METALLOGRAPHICALLY SECTIONED & EXAMINED AT 40X" and "INTERIOR SURFACES SHALL NOT YIELD MORE THAN 200 PARTICLES COLLECTED ON A 3 MICRON MILLIPORE FILTER WHEN FLUSHED WITH 960171 AT A VELOCITY OF 8 ± 1 FEET PER SECOND FOR ONE (1) MINUTE." The other drawing (607431) provided that the copper tube, in preparation for electroplating, shall be cleaned by bright dipping "IN ACCORDANCE WITH ASTM–B–281."[5]

Bright dipping under ASTM–B–281 is an acid bath that can be used to clean the copper tube, but is not an adequate process to attain specified conditions for the assembled end item. The drawings and notes clearly are not "design" specifications that set forth in precise detail the manner in which the work was to be performed. They were the typical "performance" type specifications that set forth the standard to be achieved, with the contractor expected to use good shop practice to determine how to meet that standard.[6] Under such specifications, the contractor is responsible for the means and methods selected to achieve the end result.[7]

Plaintiff developed the Shuey Process No. 1000, and the other cleaning process offered to rework rejected pieces, to overcome its production deficiencies and prevent termination for default. Plaintiff, under a fixed price contract, is responsible for such unanticipated costs.[8] The same contract specifications were used by two other contractors in additional procurements of this end item. The fact that other contractors were able to produce the fill tube retainer assembly without difficulty confirms the adequacy of the specifications.

Plaintiff claims that the contracting officer abused his discretion by not inquiring prior to award of the contract about the alleged deficiencies in the specifications that were disclosed in plaintiff's July 10, 1972, transmittal of the independent laboratory report. Plaintiff also asserts defendant had a duty to inquire about the price

---

3. 41 U.S.C. § 322 (1976).

4. *Dale Ingram, Inc. v. United States,* 475 F.2d 1177, 1185, 201 Ct.Cl. 56 (1973); *Hyman Const. Co. v. United States,* 564 F.2d 939, 944, 215 Ct.Cl. 70 (1977).

5. ASTM–B–281, under the heading "Tarnish and Stain Removal, Neutralization," states in pertinent part:

"(c) *Bright Dipping.*—... Bright dipping is intended primarily to improve surface luster of the work. It may also be used for removal of light oxides on forging and castings. Maximum surface luster (not mirror brightness) may be obtained by immersing the work with constant agitation for 5 to 10 sec in one of several solutions, one of which follows: ...".

6. *Simmons Co. v. United States,* 412 F.2d 1360, 1372, 188 Ct.Cl. 684 (1969).

7. *Penguin Indus., Inc. v. United States,* 530 F.2d 934, 937, 209 Ct.Cl. 121 (1976).

8. *ITT Arctic Services, Inc. v. United States,* 524 F.2d 680, 691, 207 Ct.Cl. 743 (1975); *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918).

disparity between its $4.50 price per item and Litton Systems' $10.17 price.

Plaintiff contends that its July 10, 1972, letter obligated defendant to clarify the specifications to plaintiff and other potential bidders. Plaintiff's July 10, 1972, letter was not a request to clarify the specifications; it was a report on technical problems that had caused pieces to be rejected.

■ Plaintiff submitted its unsolicited bid in September 1972, with full knowledge of the contamination problem it had experienced. Plaintiff was aware it had a contamination problem, yet sought its second contract with no change in specification requested. If plaintiff believed the specifications were defective, it had a duty to seek clarification at that time.[9]

The technical report from the independent laboratory did not provide defendant with more knowledge than plaintiff already possessed. Experience with other contractors did not disclose any specification defect, and there is no evidence that defendant possessed material information it withheld from plaintiff, or from any other potential bidder.

Plaintiff argues that the contracting officer abused his discretion because he did not seek a competitive range of qualified sources, that the two bids were inadequate for competition, and that the disparity between $10.17 Litton Systems' price per item from plaintiff's $4.50 per item, should have put defendant on notice of inadequate competition and imposed a duty to investigate. The Board did not resolve these issues because it found such arguments were not pertinent to a claim under the contract's Changes and Disputes clauses. Plaintiff's contentions have no support in the administrative record.

■ In a negotiated procurement, the contracting officer has broad discretion, and review is limited to a determination of whether his acts were arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law, or in excess of statutory authority.[10] Plaintiff's motion does not show a falling below these standards.

■ The contracting officer testified before the Board that plaintiff was a small business and that he thought the price difference reflected the differences in the respective company's overhead costs. On other occasions such bid disparities had been observed, and he concluded that they posed no cause for concern in this case. Plaintiff's price per unit on its first contract was $2.77, and on this contract was $4.50. This 60 percent increase could be acceptable to a contracting officer as reasonable in the light of plaintiff's prior production difficulties.

Failure to inquire about the disparity with the Litton Systems' bid is reasonable in the circumstances. No inquiry is necessary in a negotiated procurement when there is adequate competition or accurate prior cost experience shows the price is reasonable.[11]

Accordingly, defendant's motion for summary judgment is allowed, plaintiff's cross-motion for summary judgment is denied, and the complaint will be dismissed.

9. *Beacon Const. Co. v. United States,* 314 F.2d 501, 504, 161 Ct.Cl. 1 (1963).

10. *Scanwell Laboratories v. Shaffer,* 424 F.2d 859, 874 (D.C.Cir.1970); *Baird Corp. v. United States,* 1 Cl.Ct. 662, 666 (1983).

11. 10 U.S.C. § 2304(g) (1976); *Burroughs Corp. v. United States,* 617 F.2d 590, 598, 223 Ct.Cl. 53 (1980).