**C. SANCHEZ AND SON, INCORPORATED,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

No. 90–386 C.

United States Claims Court.

Aug. 8, 1991.

Durward E. Timmons, Colorado Springs, Colo., for plaintiff; Murray I. Weiner, of counsel.

Joan M. Bernott, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Washington, D.C., for defendant; Lisa H. Clay and Annette B. Kuz, U.S. Army Corps of Engineers, of counsel.

## OPINION AND ORDER

TURNER, Judge.

Plaintiff was awarded a contract by the U.S. Army Corps of Engineers on September 30, 1986 for the construction of an artificial battlefield at Fort Hunter Liggett, California. Subsequently, plaintiff entered into a subcontract with I.C.G. Electric, Inc. (ICG) to perform substantially all electrical work under the prime contract. The contract between Sanchez and the Corps of Engineers required the installation of several electrical systems such as an interior electrical wiring system, an underground electrical distribution system, a telephone system, a protective lighting system and a lightning protection system. Plaintiff also agreed to perform all trenching and backfilling associated with the installation of these electrical systems.

After construction was complete, the contracting officer issued three final decisions denying equitable adjustments on three claims submitted by Sanchez on behalf of ICG. The claims asserted entitlement to equitable adjustments arising from the Army's refusal to grant a waiver of the Buy American Act, the Army's directive that a rollover protective structure (ROPS) be installed on ICG's trencher, and the Army's refusal to allow substitution of aluminum-sheathed data cable in place of the steel-sheathed cable required by the contract. Plaintiff appeals these final decisions.

Defendant has filed a motion for summary judgment alleging that there are no

material facts in dispute and that it is entitled to judgment as a matter of law on all three claims. Plaintiff contends that there are material facts in dispute and that this case should proceed to trial. The genuine issues identified in plaintiff's response to defendant's motion for summary judgment and in plaintiff's statement of genuine issues (both filed on May 7, 1991) are essentially legal questions based on historical facts which are undisputed. We conclude, therefore, that this case presents no genuine issue of material fact for trial. We further conclude that defendant's motion for summary judgment should be granted.

## I. BUY AMERICAN ACT CLAIM

### A. *Facts*

The contract required plaintiff and its subcontractors to comply with the Buy American Act, 41 U.S.C. §§ 10a–10d (BAA), which provides that the government give preference to domestic construction material during the performance of government contracts. *See* 48 C.F.R. § 52.225–5; Contract Clause 33—Buy American Act—Construction Materials (APR 1984); DX D, p. 41. Accordingly, plaintiff agreed that only domestic construction material would be used by the contractor, subcontractors, materialmen and suppliers in the performance of this contract except for foreign construction materials listed in the contract. 48 C.F.R. § 52.225–5(b). ICG bid the subcontract for electrical work using price quotes for wire and cable manufactured in Canada by Canada Wire and Cable Limited. The Canadian wire was supplied to ICG through an American company, Houston Wire and Cable Co. At the time ICG submitted its bid to Sanchez, it believed in good faith that this wire and cable complied with the provisions of the BAA (PX 1). In preparing its bid to the Corps, Sanchez relied on the interpretations made by ICG regarding BAA requirements (PX 2).

Sanchez requested approval to use the material manufactured by Canada Wire from the Corps on February 12, 1987 (DX H). The submission included a letter from ICG to Sanchez explaining its belief that the wire complied with the BAA (DX I). The Corps disapproved the use of the wire on February 19, 1987, stating that it did not conform with the BAA (DX I). In a letter to Houston Wire and Cable Co., the Corps explained that the BAA requires construction materials to be made in the United States and to contain at least 50% American-made components. Since the proposed wire was actually manufactured in Canada, the Corps refused to accept it for use in government contracts (DX J). Houston Wire and Cable Co. responded with a letter to the Corps explaining that over 50% of the components of the proposed material were American-made and the final stages of its fabrication would occur in Houston, Texas, thus bringing it within the definition of a "domestic construction material" for purposes of the BAA. *See* 48 C.F.R. § 52.-225–5(a).

Sanchez resubmitted its proposal to use the wire supplied by Canada Wire on April 9, 1987. The submittal contained an option to use equivalent wire and cable manufactured by an American company, the Okonite Co. Okonite's product was more expensive than the material supplied by Canada Wire. The Corps approved the cable supplied by Okonite without exception and disapproved the cable supplied by Canada Wire because it did not comply with the BAA. Following the Corps' rejection of the Canadian material, the contracting officer's authorized representative, William Strid, met with ICG's president, Michael Gilbreth. Gilbreth informed Strid that Canada Wire's products were $100,000 less expensive than the equivalent domestic wire and cable. He also informed Strid that the domestic source, the Okonite Co., did not have sufficient current inventory to meet the contract schedule while Canada Wire's products were available within the required time frame (PX 1, ¶ 8). Strid replied that there was nothing he could do and that ICG would have to use an American-made product.

Following the Corps' rejection of the Canadian material, ICG purchased the more expensive wire and cable from the Okonite Co. and proceeded to install it. On June 16,

1987, Sanchez forwarded to the Corps ICG's notice of intent to file a claim for alleged increased costs because of the Corps' disapproval of the use of wire and cable supplied by Canada Wire (DX O). On behalf of ICG, Sanchez filed a claim with the contracting officer on July 11, 1988.[1] Sanchez's claim was based on the theory that the Canadian wire was a "domestic construction material" for purposes of the BAA or alternatively, that Sanchez was entitled to a post-award waiver of the BAA. It requested an equitable adjustment totaling $879,342. The Corps responded on October 21, 1988 with a letter to Sanchez denying the merit of its claim (PX 4). The contracting officer issued its final decision on February 16, 1990 denying plaintiff's claim for an equitable adjustment to the contract price (DX BB).

### B. *Discussion*

Clause 33 of plaintiff's contract requires Sanchez and all its subcontractors to comply with the BAA. It states:

(a) The Buy American Act (41 U.S.C. 10) provides that the Government give preference to domestic construction material.

. . . .

"Domestic construction material," as used in this clause, means (1) an unmanufactured construction material mined or produced in the United States, or (2) a construction material manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. Components of foreign origin of the same class or kind as the construction materials determined to be unavailable pursuant to subparagraph 25.202(a)(3) of the Federal Acquisition Regulation (FAR) shall be treated as domestic.

(b) The Contractor agrees that only domestic construction material will be used by the Contractor, subcontractors, materialmen, and suppliers in the performance of this contract, except for foreign construction materials, if any listed in this contract.

*See also* 48 C.F.R. §§ 52.225–5(a), 25.201.

This language reiterates the BAA's statutory mandate requiring contractors to use American-made materials and supplies in public construction contracts. *See* 41 U.S.C. §§ 10a, 10b. Exceptions to the BAA requirements may be allowed if the agency head concerned determines that purchase of the American-made material is "inconsistent with the public interest" or its cost is "unreasonable." 41 U.S.C. § 10d. Executive Order No. 10,582 provides uniform procedures for determining when exceptions to the BAA shall be made. Exec. Order No. 10,582, 3 C.F.R. 230 (1954–1958), *reprinted in* 41 U.S.C. § 10d (1988). Pursuant to § 2(b) of Exec. Order No. 10,582, the price of materials of domestic origin shall be deemed to be unreasonable, or the purchase of such materials shall be deemed to be inconsistent with the public interest, if the price of them exceeds the sum of the price of like materials of foreign origin plus established differentials. *Id.* Plaintiff relies on the six percent differential established by § 2(c) of Exec. Order No. 10,582 which states:

The executive agency concerned shall in each instance determine the amount of the differential referred to in subsection (b) of this section on the basis of one of the following-described formulas, subject to the terms thereof:

(1) The sum determined by computing six per centum of the bid or offered price of materials of foreign origin.

Since the cost of domestic materials supplied by Okonite exceeded the cost of the Canadian materials plus a six percent differential, plaintiff argues that an exception should have been granted for the Canadian materials.

Plaintiff, however, never submitted a formal request for a waiver of the BAA to the appropriate agency head. In this case, the issue is whether plaintiff's actions in repeatedly asking for approval of the Canadian wire and related oral discussions be-

---

**1.** Sanchez filed all three of its claims for equitable adjustments with the contracting officer on July 11, 1988. The three claims were properly certified on May 17, 1989.

tween the contracting officer's representative and ICG's president constituted a request for a waiver of the BAA. If so, then we must determine whether the contracting officer neglected his duty in failing to pass along plaintiff's alleged waiver request to an appropriate government official who had the authority to act on it. Only an agency head (not a contracting officer) has authority to grant or deny a waiver request. 41 U.S.C. § 10d.

Plaintiff no longer contends that the Canada Wire product actually conformed to the definition of "domestic construction material" under the BAA, implementing regulations and the contract, and thus does not now contend that it actually met the requirements of the BAA. Pl.Br. filed 5/7/91 at 10. In this litigation plaintiff relies solely on its alternative claim that it was entitled to a waiver of the BAA's restrictions.

Defendant argues that even if plaintiff may have been entitled to a waiver because the cost of domestic material was unreasonable, no timely request for a waiver was ever submitted. Plaintiff raised the waiver theory for the first time after completion of the contract when it filed a claim with the contracting officer for an equitable adjustment based on the Corps' refusal to approve the Canadian wire and cable.

■ Defendant also argues that plaintiff has not complied with the regulatory requirements for submitting waiver requests articulated in 48 C.F.R. § 25.203(b). This provision states:

> When proposed awards are submitted to the agency head for approval, each submission shall include a description of the materials, including unit and quantity, estimated costs, location of the construction project, name and address of the proposed contractor, and a detailed justification of the impracticability of using domestic materials.

The BAA and corresponding regulations such as § 25.203(b) contemplate circumstances in which a waiver is requested prior to contract award. Under Federal Circuit case law, it is clear that waivers of the BAA are also obtainable after the contract

has been awarded. *See John C. Grimberg Co. v. United States*, 869 F.2d 1475 (Fed. Cir.1989); *John T. Brady & Co. v. United States*, 693 F.2d 1380 (Fed.Cir.1982).

While the regulations do not specifically address the form which a post-award waiver request must take, we conclude that the requirements set forth in § 25.203(b) apply equally to waiver requests submitted after award of a contract. If a contractor is required by regulation to provide specific information in order to obtain a BAA waiver prior to contract award, it is only reasonable that the contractor be required to submit the same information when requesting a waiver post-award. In pertinent part, § 25.203(b) requires the contractor to submit the following information to the agency head: (1) a description of the materials for which a waiver is sought, including unit and quantity, (2) estimated costs and (3) a detailed justification of the impracticability of using domestic materials.

■ Although plaintiff never submitted this information to the government in writing, it argues that it met the requirements of § 25.203(b) because all the necessary information was communicated to the government. We conclude that the information plaintiff communicated to the government either orally or by its actions and the manner of its communication were not sufficient to meet the requirements of § 25.203(b).

The actions which plaintiff alleges constitute a request for a waiver occurred during performance of the contract. Sanchez submitted a request for approval of the wire manufactured by Canada Wire to the Corps on February 12, 1987. Accompanying the request was a letter from ICG to Sanchez dated February 5, 1987 which stated that disapproval of the Canadian wire would create an acute cost disadvantage to the subcontractor since its bid had been based on the less expensive material (DX I). The Corps denied this request stating that the proposed wire did not comply with the BAA since it was manufactured in Canada. There followed an exchange of correspondence between the Corps and ICG's supplier, Houston Wire and Cable Co., about

whether the Canadian wire could be considered a domestic construction material. Plaintiff resubmitted its proposal to use the Canadian product on April 9, 1987. This submittal contained an option to use equivalent domestic wire and cable manufactured by the Okonite Co. No information regarding the price differential between the domestic and foreign cable or the unavailability of the domestic cable was supplied to the contracting officer at this time. The Corps rejected the use of the Canadian wire because it did not comply with the BAA and approved the use of wire supplied by Okonite.

After rejection by the Corps, the contracting officer's representative, Strid, met with ICG's president, Gilbreth. At this meeting, Gilbreth informed Strid that the Canadian wire was $100,000 less expensive than the equivalent domestic wire and that the domestic source did not have sufficient inventory to meet the contract schedule. Gilbreth also informed Strid that requiring use of the domestic materials would cause severe economic hardship to ICG. Strid replied that there was nothing he could do and that ICG would have to use an American-made product. Neither the government nor the contractor raised the possibility of a post-award waiver of the BAA at this time. ICG proceeded to order the required domestic materials from the Okonite Co. and informed the Corps of its intent to file a claim based on the disapproval of the Canadian materials. Plaintiff now essentially argues that the government representative should have recognized these communications to be a request for a BAA waiver and processed them accordingly.

On behalf of ICG, Sanchez filed a claim with the contracting officer on July 11, 1988 for an equitable adjustment based on the Corps' disapproval of the Canadian wire. Construction under the contract had been completed and transferred to the government on December 15, 1987. Plaintiff's claim represented the first time it had asserted that ICG was entitled to a post-award waiver of the BAA. The contracting officer denied plaintiff's claim because Sanchez had not submitted a timely BAA waiver request.

Plaintiff relies, *inter alia*, on the Federal Circuit's decisions in *John C. Grimberg Co. v. United States*, 869 F.2d 1475 (Fed.Cir. 1989) and *John T. Brady & Co. v. United States*, 693 F.2d 1380 (Fed.Cir.1982). Neither of these cases compels the conclusion that Sanchez is entitled to a post-award waiver of the BAA. In both *Brady* and *Grimberg*, the contractors requested exceptions to the BAA during the construction phase in which the foreign material was to be used. In this case, plaintiff did not formally request a waiver of the BAA until after construction had been completed and transferred to the government. We conclude that the facts plaintiff relies on to constitute a *de facto* waiver request do not amount to one which the contracting officer would reasonably understand he had a duty to pass along to a government official with authority to act on such a request (i.e., "the agency head").

It is true that ICG's president orally informed the contracting officer's representative that use of the domestic material would be much more expensive and that it was not available in sufficient quantities to meet the contract schedule. These assertions were not submitted in writing and they were not accompanied by any information concerning the actual price differentials involved or the relative unavailability of the domestic materials. The regulations require the contractor to provide a detailed justification of the impracticability of using domestic material in addition to a description of the materials for which a waiver is sought including unit, quantity, and estimated costs. 48 C.F.R. § 25.203(b). Lacking concrete information of this nature, we cannot conclude that ICG's oral assertions constituted a request for a waiver of the BAA which the contracting officer would reasonably understand should be passed along to higher officials.

During the construction phase, the only relevant written communication on this subject was ICG's February 5, 1987 letter to Sanchez which was forwarded by Sanchez to the Corps. The focus of this letter, however, was on ICG's assertion that the Canadian wire qualified as domestic con-

struction material and not on entitlement to a waiver from the BAA's requirements. In sum, the contracting officer would reasonably have understood that ICG was attempting to persuade the Corps that the Canadian product actually qualified under the BAA, not that it was seeking a waiver of the BAA's strictures.

In *Grimberg,* the Federal Circuit stated that "[i]f all existing BAA criteria are met, the decision to grant a change is discretionary" and that on those facts, "[t]he failure to grant the requested waiver was an abuse of discretion." 869 F.2d at 1478. We do not reach the issue of abuse of discretion here. Plaintiff's post hoc attempt to establish that it requested a BAA waiver during the construction phase of this contract when such a request could reasonably have been acted upon is not convincing. We conclude that plaintiff did not comply with the regulatory requirements for submitting a request for a waiver of the BAA which are set forth in 48 C.F.R. § 25.203(b). Defendant is entitled to summary judgment on this claim.

## II. ROLLOVER PROTECTIVE STRUCTURE (ROPS) CLAIM

### A. *Facts*

Plaintiff's contract incorporated by reference the U.S. Army Corps of Engineers Safety and Health Requirements Manual (Safety Manual) and 29 C.F.R. § 1926.1000. Both the Safety Manual and § 1926.1000 address requirements for attaching ROPS to certain types of construction equipment in order to protect the operator if the equipment accidentally rolls over during use. At the time it bid the subcontract, ICG was aware that the Safety Manual and 29 C.F.R. § 1926.1000 were incorporated into the contract by reference. ICG planned to use its Vermeer T–600D trenching machine to dig the trenches required by the contract. When computing its bid price, ICG did not include the cost of installing ROPS on its trencher because ICG did not believe that ROPS was required for that trencher under the contract terms. ICG based its belief on past experience as

well as its interpretation of the Safety Manual and C.F.R. provision, an interpretation shared by the manufacturer of the trencher (PX 1). Sanchez relied on ICG's interpretation and subcontract bid when submitting its bid for the prime contract to the Corps (PX 6, ¶ 5).

After contract performance had begun, the Corps held a safety meeting on June 4, 1987 with representatives from the plaintiff. At the meeting, the Corps directed that ICG install ROPS on its trencher. The day after the safety meeting, Sanchez wrote to the Corps requesting a waiver of the ROPS requirement (DX vol. II, p. 165). It based this request on information supplied by Vermeer, the trencher manufacturer, stating that installation of ROPS on the T–600D trencher would be inappropriate (DX R). The chief of the Corps' Safety and Occupational Health Office, Richard R. Adams, analyzed the ROPS requirement as it pertained to Vermeer T–600D and T–650D trenchers (DX T). Based on this review, the Corps approved plaintiff's request for a waiver, but only when the T–600D trencher was working on slopes of 3% or less (DX U). Because of conditions found on the construction site, this limitation effectively meant that ICG could not use its trencher without ROPS. Thereafter, ICG contracted with Saf–T–Cab, Inc. to fabricate a ROPS for the trencher. While the ROPS was being built and installed, ICG lost the use of its T–600D trencher from July until September 1987.

In an attempt to mitigate damages and maintain the contract schedule, ICG rented an additional trencher (a Vermeer T–650D) to perform trenching for the contract. ICG submitted a trenching plan to the Corps on August 26, 1987 outlining its intended use of the T–650D trencher in addition to the T–600D trencher (PX 9). Accompanying the trenching plan was a letter explaining that ICG still maintained that any requirement for a ROPS on the trenchers was outside the scope of the contract documents. The Corps approved the use of the T–650D trencher without ROPS.

Plaintiff filed a claim with the contracting officer on behalf of ICG requesting an

equitable adjustment for increased costs incurred when the Corps required installation of ROPS on ICG's trencher. Plaintiff maintained that the ROPS requirement constituted a contract change and requested relief totaling $869,091. This amount included the direct costs of the ROPS in addition to the costs of renting additional trenching and other equipment, increased labor costs, overhead, administrative expenses and profit. The contracting officer denied plaintiff's claim in a final decision dated February 16, 1990 (DX CC). The contracting officer found that a reasonable interpretation of the Safety Manual and 29 C.F.R. § 1926.1000 indicated that plaintiff was contractually obligated to install ROPS on the Vermeer T-600D trencher.

### B. *Discussion*

█ Plaintiff contends that the contract did not require installation of ROPS on its T-600D trenching machine while defendant contends that it did. The parties agree that the contract incorporated by reference the U.S. Army Corps of Engineers Safety and Health Requirements Manual (Safety Manual) and 29 C.F.R. § 1926.1000. Section 1926.1000 contains minimum performance criteria for ROPS after installation. Accordingly, we conclude that it is not relevant to the issue of whether ROPS must be installed on certain types of construction equipment.

The relevant provision of the Safety Manual, § 18.B.20, lists the types of construction equipment on which ROPS must be installed. It states:

a. In addition to the requirements of [§§] 18.B.16., 18.B.18., and 18.B.19., seat belts and rollover protective structures (ROPS) shall be installed on *crawler* and rubber-tire *tractors such as dozers*, push and pull tractors, *winch tractors*, and mowers (except side boom pipe-laying equipment); off-the-highway self-propelled pneumatic-tire earth movers such as trucks, pans, scrapers, bottom dumps and end dumps; motor graders; water tank trucks having a tank height less than the cab; *and other self-propelled construction equipment* such as front-end loaders, backhoes, rollers, and com-

pactors. ROPS are not required on trucks designed for hauling on public highways, crane-mounted, dragline backhoes, tractors or front-end loaders only when used to unload material from barges, sections of rollers and compactors of the tandem steel-wheeled and self-propelled pneumatic tired type that do *not* have an operators station, self-propelled rubber-tired lawn and garden tractors under 20 drawbar horsepower, cranes, draglines, or equipment on which the operator's cab and boom rotate as a unit. Note: ROPS may be removed from certain types of equipment when the work cannot be performed with the ROPS in place and when ROPS removal is approved in writing by the Designated Authority.

b. *ROPS shall be installed in accordance with the manufacturer's or designer's recommendations.* The operating authority shall furnish certification from the manufacturer or a Registered Professional Engineer that the ROPS complies with the applicable standards listed in paragraphs c, d, e and f below.

DX P, p. 152 (emphasis added).

Plaintiff argues that this provision is ambiguous and that ICG reasonably interpreted it as not requiring installation of ROPS on the Vermeer T-600D trencher. Plaintiff contends that after ICG reviewed the Safety Manual, it determined that the manual did not specifically include "trenchers" or "ditchers" within the ROPS requirement. Of all the equipment mentioned in § 18.-B.20 of the Safety Manual, ICG considered the Vermeer T-600D trencher to be most similar to "side boom pipe-laying equipment" which was specifically exempt from the ROPS requirement. The T-600D trencher has a front-mounted boom and the only piece of equipment in the safety manual with a boom is the "side boom pipe-laying equipment." The Safety Manual also stated that ROPS shall be installed in accordance with the manufacturer's recommendation. Vermeer, the manufacturer, did not recommend installation of ROPS on the T-600D trencher. It stated that installation of ROPS on the T-600D trencher would be inappropriate for several rea-

sons.[2] In addition, ICG's previous experience in the construction industry was that it had never been required to install ROPS on a T–600D trencher. For all these reasons, ICG did not include the cost of ROPS in its subcontract bid. Plaintiff now seeks an equitable adjustment for the increased cost incurred when the government required ROPS to be installed on the T–600D trencher. Plaintiff contends that any such requirement is outside the scope of the contract.

Defendant argues that the contract unambiguously requires ROPS to be installed. Although the Safety Manual does not specifically list trenchers, a reasonable interpretation of § 18.B.20(a) compels the conclusion that ROPS is required on the Vermeer T–600D trencher. The trencher is a crawler tractor similar to "dozers" and is plainly a piece of "self-propelled construction equipment." Specifically, it is in essence the same as a crawler or winch tractor with trenching attachments. A comparison of the pictorial representations in the record shows that the T–600D trencher is nearly identical to a crawler tractor except for the front-mounted boom and trenching attachments. *Compare* DX T, p. 184 *with* PX 5, Fig. 7.1.

We are mindful of the affidavit of Mr. Ivan Brand, Product Safety Manager for Vermeer Manufacturing, submitted by plaintiff. In his affidavit, Brand states that in his opinion the Vermeer T–600D trencher is not a "crawler tractor." We disagree, however, and find no ambiguity in the Safety Manual provision. Furthermore, since the Safety Manual clearly requires ROPS to be installed on the trencher, we need not turn to custom and practice in the industry to aid in interpreting § 18.-B.20(a). It is well-established that evidence of trade usage may not vary or contradict unambiguous contract language. *George*

*Hyman Constr. Co. v. United States*, 215 Ct.Cl. 70, 81, 564 F.2d 939, 945 (1977); *McDevitt Mechanical Contractors, Inc. v. United States*, 21 Cl.Ct. 616, 620 (1990). We recognize that § 18.B.20(b) of the Safety Manual requires ROPS to be installed according to the manufacturer's recommendations and that Vermeer took the position that installation of ROPS on the T–600D trencher was inappropriate. We view § 18.B.20(b), however, as pertaining to installation of ROPS after it has been decided under § 18.B.20(a) whether ROPS is required.

■ Plaintiff's request for waiver of the ROPS requirement was approved when the trencher was working on slopes of 3% or less (DX U). Plaintiff's alternative argument is that the Corps' action in granting a waiver on slopes of 3% or less had no rational basis and was arbitrary. We find no merit in this argument. The contract required installation of ROPS on the T–600D trencher. Any approval by the government of a request for a waiver from this contract requirement would have been purely discretionary. The plaintiff agreed to the provision requiring installation of ROPS. We cannot vacate this agreement by holding that the government abused its discretion in not granting a waiver to an item that was required by the contract.

### III. STEEL–SHEATHED CABLE CLAIM

#### A. *Facts*

Plaintiff's contract required the use of steel-sheathed data cable in specified areas. On behalf of ICG, plaintiff requested to substitute aluminum-sheathed data cable for the steel-sheathed data cable required by the contract. The reason for this request was that ICG's supplier, the Okonite

---

**2.** These reasons included the following: (1) The machine in operation has a trencher boom which extends down into the ground. This prevents a rollover when trenching. This machine is used exclusively as a trencher. (2) The machine has a low center of gravity and wide track base making it very stable. (3) The operator is side-mounted thereby providing a quick and virtually unhindered egress. (4) The presence of

ROPS would not allow the transport width to remain at less than eight feet. The total width of the machine with a rigid ROPS would be in excess of nine feet. This would be a substantial hindrance when transporting the machine on most roads and highways. This increased width would also result in increased transport risk. DX Q.

Co., had experienced a delay in the acquisition of steel and anticipated a delay of two months or more for the shipment of the steel-sheathed cable. Okonite proposed substituting aluminum-sheathed data cables of superior quality at no extra cost in order to avoid delay of the contract schedule (PX 15). The Corps denied plaintiff's request on July 20, 1987 based on the design engineer's intention that steel-sheathed data cable be used in order to prevent any interference on the data line (DX X).

Based on the Corps' refusal to allow substitution of aluminum-sheathed data cable, plaintiff submitted a claim to the contracting officer for an equitable adjustment to the contract price totaling $297,345. This amount included costs associated with the delay in obtaining steel-sheathed data cable such as increased labor charges, and equipment and administrative expenses. Plaintiff's claim was based on the material and workmanship clause of the contract which allows the contractor to substitute materials of equal quality under certain circumstances. *See* 48 C.F.R. § 52.236–5; Contract Clause 47—Material and Workmanship (APR 1984); DX D, p. 50. The contracting officer denied plaintiff's claim by final decision dated February 16, 1990 (DX DD) which stated that steel-sheathed cable was required by the specifications and Clause 47 did not give the contractor a right to substitute material under these circumstances.

### B. *Discussion*

█ The contract requirement for the use of steel-sheathed data (telephone) cable states:

4. MATERIALS AND COMPONENTS: Materials and components shall conform to the following requirements:

. . . .

4.1.3 Direct buried cable: All direct buried cables shall have a sheath of continuous welded, corrugated steel armor with a tight fitting PVC jacket and shall meet or exceed the requirements of REA Specification PE–39.

DX 122.

Plaintiff now argues that defendant's failure to reasonably consider plaintiff's request to substitute cable constitutes an abuse of discretion and a breach of the duty to cooperate and not hinder performance. Plaintiff relies on the material and workmanship clause of the contract to support its position that it had a right to substitute an equal or superior material for any material named in the specifications. This contract clause states:

47. MATERIAL AND WORKMANSHIP (1984 APR)

(a) All equipment, material, and articles incorporated into the work covered by this contract shall be new and of the most suitable grade for the purpose intended, unless otherwise specifically provided in this contract. References in the specifications to equipment, material, articles, or patented processes by trade name, make, or catalog number, shall be regarded as establishing a standard of quality and shall not be construed as limiting competition. The Contractor may, at its option, use any equipment, material, article, or process that, in the judgment of the Contracting Officer, is equal to that named in the specifications, unless otherwise specifically provided in this contract.

(b) The Contractor shall obtain the Contracting Officer's approval of the machinery and mechanical and other equipment to be incorporated into the work. ... Machinery, equipment, material, and articles that do not have the required approval shall be installed or used at the risk of subsequent rejection.

*See also* 48 C.F.R. § 52.236–5; DX D, p. 50.

This clause does not give plaintiff the right to substitute aluminum-sheathed cable under the circumstances of this case. The contracting officer noted that "[t]he purpose and intent of Clause 47 is 'to discourage the potentially monopolistic practice of demanding the use of brand-name or designated articles in government contract work.'" DX DD, p. 246 (quoting *Jack Stone Co. v. United States,* 170 Ct.Cl. 281, 287, 344 F.2d 370, 373–74 (1965)). In this case, the specifications did not require use of a particular trade name or manufactur-

er; they simply required that the cable sheath be made of steel. As the contracting officer explained, "[t]he requirement for steel is not an attempt to limit competition or specify a particular manufacturer's product, it is merely a generic name for a common material. As such, it does not establish a 'standard of quality' within the meaning of Clause 47, such that the contractor might offer an allegedly equal material." DX DD, p. 247. We agree with this analysis and conclude that plaintiff's claim to substitute aluminum-sheathed for steel-sheathed cable does not fall within the purview of Clause 47.

Plaintiff raises the Court of Claims decision in *W.G. Cornell Co. v. United States,* 179 Ct.Cl. 651, 376 F.2d 299 (1967) as support for its position. In *W.G. Cornell Co.,* the specification at issue required rigid insulation material yet contained the phrase, "or other equally suitable material approved by the Contracting Officer." 179 Ct.Cl. at 656, 376 F.2d at 303. The court held that the flexible insulation plaintiff sought to use complied with the specification because on the basis of trade usage, it could be considered "other equally suitable material." *Id.* at 671, 376 F.2d at 312. Accordingly, the plaintiff was allowed to recover the difference between the rigid insulation installed and the flexible insulation on which it based its bid. However, the specification in plaintiff's contract does not allow the use of other material and the material it sought to use (aluminum-sheathed cable) did not comply with the contract requirements. Furthermore, plaintiff presented no evidence of custom or trade usage on this point.

■ As to plaintiff's contention that the Corps breached its duty to cooperate and not hinder performance of the contract, we simply state that the circumstances of this case do not rise to the level of a breach of this duty. Nothing in the record supports a finding that the government acted in bad faith. *See* Restatement (Second) of Contracts, § 205, comment d (1979) (bad faith includes interference with or failure to cooperate in the other party's performance).

## IV

Based on the foregoing, defendant's motion for summary judgment filed on January 29, 1991 is GRANTED. It is, therefore, ORDERED that judgment be entered in favor of the defendant. Pursuant to RUSCC 54(d), costs shall be allowed to the defendant ("the prevailing party").